Filed 10/15/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL EDWARDS,<br><br>    Defendant and Appellant. | H038422<br>(Santa Clara County<br>Super. Ct. No. CC512062) |

In 2005, 17-year-old defendant Michael Edwards and a group of friends from East Palo Alto drove to a high school house party in San José.  Following an argument between the partygoers and defendant's friends, members of defendant's group fired multiple gunshots at a crowd gathered on the lawn in front of the house.  A bullet struck 18-year-old Michael DeJesús in the head, fatally wounding him.  This incident followed a similar shooting at a Sunnyvale party three weeks earlier in which teenager Ivan Cruz was shot but survived.

The prosecution charged defendant as an adult with four counts:  Count One—murder for the death of DeJesús in San José; Count Two—shooting at an inhabited dwelling in San José; Count Three—assault with a firearm upon Cruz in Sunnyvale; and Count Four—shooting at an inhabited dwelling in Sunnyvale.  All four counts included firearm and gang-related enhancements.  The jury found defendant guilty of second degree murder in Count One and shooting at an inhabited dwelling in Count Two.  The jury hung on the two counts related to the Sunnyvale shooting and returned no findings

on any of the enhancements.  The trial court sentenced defendant to a total term of 22 years to life.

Defendant raises numerous claims on appeal.  We hold the trial court erred in two respects.  First, the court erroneously excluded expert testimony offered by defendant to impeach the prosecution's gang expert.  Second, the court erroneously admitted testimonial hearsay through the prosecution's gang expert in violation of *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).  Both errors were harmless, however.  And we conclude defendant's remaining claims lack merit.  Accordingly, we will affirm the judgment.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

A. *Facts of the Offenses*

In November 2005,[2] defendant was 17 years old.  He wore his hair in dreadlocks three to four inches long with the tips dyed blond or gold.  The prosecution charged him as an adult in connection with two shootings—the fatal shooting of Michael DeJesús at a party in San José on November 25, and the nonfatal shooting of Ivan Cruz at a party in Sunnyvale on November 5.  The jury convicted defendant on the charges related to the November 25 shooting of DeJesús, but hung on the charges related to the November 5 shooting of Cruz.  We describe the shooting of DeJesús first.

1. *The November 25 Shooting Death of Michael DeJesús in San José*

a. *Overview*

On November 25, a group of 20 to 25 high school friends held a party at the home of Hector and Gilbert Guel in San José.  The house stood on the corner of Carobwood Lane and Madrid Drive.  Two or three streetlights illuminated the area.  Hector asked

---

[1] Defendant raises additional claims in a separate petition for habeas corpus.  (*In re Edwards*, H040572.)  We deny defendant's petition in a separate order on this date.

[2] All dates refer to 2005 unless otherwise stated.

Jesús "Chuy" Cazares-Soriano—a large, "rather stocky" football player—to "look out for the house" and make sure "nothing went down."[3]

At around 10:45 p.m., a large group of African-American males arrived at the party. Several Latina or African-American females accompanied them. The group included Tramel Walker, Lavell Jordan, and defendant. Later that evening, two of the African-American males got into an argument with Chuy outside, in front of the house. Many of the partygoers came out of the house to see the dispute. One of the African Americans then yelled, "Taliban up," whereupon the group of African Americans and the girls with them retreated to their cars parked just down the street.

Two or three of the African-American males returned from their cars wielding guns. They stood in the street in front of the house, pointed their guns toward the party, and fired multiple gunshots. One of the gunmen was an African-American male with blond- or gold-tipped dreadlocks. DeJesús, one of the partygoers, was standing in front of the house when a bullet struck him in the head. He died the next day.

b. *Testimony of Matthew Tracy*

Matthew Tracy, one of the partygoers, gave the most detailed testimony about the shooting. Matthew served as a Marine in Iraq and was familiar with firearms. He arrived at the party around 9:15 or 9:30 p.m. that evening. He testified that he and Chuy, with whom Matthew had played football, stood at the front door for much of the party. Chuy was "keeping an eye out," and making sure "everyone just had a good time and nothing bad happened." Matthew was "used to kind of helping out in that situation."

At around 10:45 p.m., Matthew saw a group of about 16 African-American males and four African-American or Latina females arrive at the party. They drove up in four

---

[3] Because several witnesses shared last names, the briefs and the record referenced most witnesses by their first names. The briefs and the record also referred to Jesús as "Chewy," but the Spanish nickname for Jesús is more commonly spelled "Chuy." To avoid confusion, we will generally refer to the witnesses by their first names, and we will refer to Jesús Cazares-Soriano as "Chuy."

separate vehicles, one of which was an SUV.  When they arrived, they told Matthew they were from East Palo Alto and asked if gang signs and colors would be permitted.  Matthew told them the party was "neutral," and he allowed them to join the party.

Matthew noticed that one of the African-American males had blond-tipped dreadlocks about three to four inches long.  He wore a black hoodie, a black shirt with a white logo, baggy pants, and black tennis shoes.  Matthew estimated he was 18 or 19 years old and 5 feet 9 inches tall.  Once in the house, the man with the blond-tipped dreadlocks and one other African-American male drank shots of alcohol.  The other African-American male was about 5 feet 8 inches tall and had a gold grill on his teeth.

While the two African Americans who had been doing shots remained inside, five other members of the group walked outside.  They started getting "rowdy" and throwing bottles and cans they had taken from a recycling container.  Matthew and Chuy approached them and asked them not to cause any problems.  They got "mouthy" with Chuy and told him to "fuck off."  At that point, Chuy "got a little confrontational."

Matthew then saw two of the five African Americans run back into the house.  When Matthew turned around, he saw Chuy and some other partygoers yelling at some of the African Americans out in the street.  The African Americans were throwing gang signs and saying:  "East Palo Alto.  We're from EPA."  One of the partygoers responded: "Well we're from San José."  Matthew thought that response was a joke based on the partygoer's tone of voice.  At that point, there was a lot of swearing and loud "verbal exchanges."  Many of the partygoers had come outside to see the commotion.

The group of African Americans then began leaving the party.  Matthew heard the females who were with them say, "let's get out of here," and "let's run."  Matthew saw the African American with the blond-tipped dreadlocks and one of his male friends approach one of the cars in the street.  One of the males went to the driver's side of the car while the other went to the passenger's side.  Matthew then saw them run back to the middle of the street.  Matthew was standing about 12 to 15 yards away at the time.

Matthew testified that the African American with the blond-tipped dreadlocks pointed a black metallic gun at the house and yelled, "clear out." He was holding the gun sideways at a 90-degree angle. The gun looked like a semiautomatic to Matthew because it did not have a "distinctive circular shape" like that of a revolver. Matthew saw the shooter cock it by pulling back on the slide. Matthew later told police the gun was a nine-millimeter Glock.

Matthew turned around and began running back to the house. At that point, he heard approximately three or four gunshots. Matthew believed the shots were fired from two different caliber weapons based on the distinctly different sounds they made. When he was two or three feet from the porch of the house, he briefly looked back toward the street. He saw a muzzle flash from the gun held by the African American with blond-tipped dreadlocks. As the gunshots were being fired, the gunman was yelling: "EPA. This is EPA." He was pointing the gun toward the porch of the house as he was firing.

Matthew saw a second African-American male standing two or three feet away from the gunman with the blond-tipped dreadlocks. Matthew testified that the second African American was the one with the gold grill, whom Matthew had seen earlier drinking shots inside. He too had his arm extended towards the house at a 90-degree angle, but Matthew did not see him shoot a gun. Although Matthew had initially told the police he had seen a second shooter, Matthew testified that he had assumed the second man was a second shooter. He made this assumption because of the two different calibers of gunfire and the proximity of the two shooters. Matthew estimated the shooters fired a total of about 25 to 27 gunshots, but he did not count them. He had previously told police that he heard two gunshots fired by the African American with the blond-tipped dreadlocks, and three gunshots fired by the other shooter.

After the gunmen opened fire, Matthew felt one of the bullets fly past him. He heard it make a thud as it hit a wall. He then heard a second thud as DeJesús, who had been shot, fell to the ground. Matthew tried to move people into the house. After he

5

reached the inside of the house, he heard tires screeching as the shooters and their friends drove away. When he came back outside, Matthew saw Chuy holding DeJesús, who was on the ground and bleeding. They used towels to apply pressure to DeJesús' wound. The police arrived shortly thereafter.

Approximately five months later, the police showed Matthew a photographic lineup, but he was unable to identify any of the photos as that of the shooter with blond-tipped dreadlocks. At trial, Matthew did not identify defendant as the shooter.

### c. *Testimony of Jerry Pontipiedra*

Jerry Pontipiedra, one of the partygoers, was smoking a cigarette on the lawn of the house when he saw Chuy confront a group of African-American males. One of the African Americans then yelled "Taliban up" to one of his friends. The friend went into the house and came back out with a number of the other African Americans. At that point, other people started coming out of the house to see what was going on as the African Americans ran to their cars. Jerry then saw some of the African Americans standing in the middle of the street and pointing guns at the house, whereupon he turned around and ran for cover. He could not recall how many people were pointing guns, but he saw at least one of them with his arm held out parallel to the ground, aiming a gun at the crowd. He did not actually see the shooting, but after he turned to run he heard gunshots. He stayed inside the house until "the coast was clear." Afterward, he saw the victim lying on the ground outside, bleeding.

### d. *Gilbert Guel*

Gilbert Guel was at the party when he saw a group of African-American males accompanied by a number of females arrive in two or three cars. One of the African-American males had blond-tipped dreadlocks.

Gilbert was standing outside when he saw Chuy arguing with a couple of the African-American males by the garbage cans. One of them was wearing a hoodie and had dreadlocks past his shoulders. Gilbert testified he could not see what color the

6

dreadlocks were because it was dark, so they appeared black.  But he admitted he had previously told police he had seen a "20-something" person weighing 170 to 178 pounds, with gold teeth and long dreadlocks with yellow tips.  He also admitted that he told police he saw this person fire a gun.  He testified, however, that he had told police about the color of the dreadlocks only because he had seen that person earlier at the party.  He also testified that he had seen another person at the party who had red dreadlocks.

Gilbert saw two African-American shooters standing in the street.  They had previously left the party, but they had returned.  They both had dreadlocks, and one was wearing a hoodie.  One held his gun sideways—90 degrees to the ground—and the other held his gun "the proper way."  Both pointed their guns at the house.  Gilbert heard seven or eight gunshots fired, and he saw sparks coming from the guns as they were fired.  He tried to get himself and everyone else back into the house, but the door was too crowded.  About ten people were scattered around on the lawn outside the house.  By the time Gilbert got into the house, the gunshots had been fired.

e.  *Testimony of Jesús "Chuy" Cazares-Soriano*

At Hector Guel's request, Jesús "Chuy" Cazares-Soriano agreed to "look out for the house" and make sure "nothing went down."  He testified "it was all going good" until a group of African-American males arrived.  When they first arrived, they were "just having a good time."  Later, Chuy was outside smoking a cigarette when he heard a bottle break and someone called his name.  He approached the group of African Americans and told them to leave.  The interaction turned confrontational, with both sides swearing and yelling back and forth.  People started coming out of the house, and the African Americans ran away.  Just before they ran away, the African Americans started saying "Taliban up."  Chuy did not hear anyone yell "EPA."

When the African Americans ran away, Chuy thought the confrontation was over.  But when he turned around to go back to the party, he heard gunfire.  He jumped behind a

7

car and did not see anyone firing a gun. After the gunfire was over, he ran to the door of the house and saw DeJesús on the ground.

### f. *Testimony of Elida Janet Garcia*

Elida Janet Garcia was one of the females who accompanied the group of African-American males to the party. She testified under a grant of immunity. She was good friends with Yanet Flores-Garcia, another one of the females who came to the party from East Palo Alto. Janet testified that the group included defendant, Tramel, Lavell, Yanet, Aisha White, Marcus—also known as "Big Mark"—and several others. Defendant was the only one of the group who had the tips of his dreadlocks dyed blond. Janet drove some of the group to the party in her car—a purple four-door Toyota RAV4. Defendant, Yanet, Aisha, and Marcus were in Janet's car. The rest of the group went in one or two other cars. When they arrived, they all parked down the street on Carobwood Lane, on the other side of the intersection with Madrid Drive.

Before they entered the party, Janet saw defendant put something in her glove compartment. She was not sure what the item was, but at the time she assumed it was a gun based on the way defendant had it covered. There was no discussion about it. She then locked the glove compartment.

When they entered the party, they all went into the back room where there was a DJ. Janet testified that she drank a lot of alcohol—"enough where I was buzzed," or "[u]nder the influence." She gave her car keys to Yanet.

At some point, Janet heard yelling outside, and everybody walked out of the party. She saw bottles flying in front of the house; they were coming from the street. She testified "[i]t was the Mexican guys" at the party who were breaking bottles, not her African-American friends.

Janet ran to her car. As she was running, she heard someone yell "clear" or "clear out." When she reached her car, she heard multiple gunshots coming from different directions. While standing next to her car and facing the house, Janet saw defendant,

8

Tramel, and Lavell standing in the area between her and the house. All three men were facing the house. Defendant was crouched down with both arms extended toward the house when she heard shots fired. Tramel was standing about 25 feet in front of her with one arm extended in front of him toward the house. The sound of gunshots came from defendant and Tramel. Nobody else was standing around them. Janet could not remember what position Lavell's arms were in.

After the gunshots were fired, Janet, Yanet, Marcus, and Aisha jumped into Janet's car to drive away. Yanet was crying and "freaking out." Janet was "[c]onfused, drunk." They were about to drive away when defendant jumped into the car. They drove away, entered the freeway, and drove to downtown San José. Janet had to pull off the freeway because she could not drive. She switched places with Marcus, who took over driving.

Janet testified that defendant asked for her keys after they parked in downtown San José. She assumed he put a gun into her glove compartment, but she never saw a gun.

The police had interviewed Janet on November 29, four days after the shooting. At trial, the prosecution played numerous video clips from the interview. In the interview, Janet told police defendant took a gun from his jeans pockets and put it in her glove compartment before the party. She also described defendant's body posture during the shooting. She mimicked his posture by leaning forward and extending her arms out in front of herself with both hands clasped together.

g. *Testimony of Yanet Flores-Garcia*

Yanet Flores-Garcia also testified under a grant of immunity. She went to the party in Janet's car along with defendant, among others. Yanet estimated that defendant was about six feet tall and weighed 190 to 200 pounds at the time. He wore his hair in dreadlocks with gold coloring at the end. He had a gold "grill" on his bottom teeth and he was wearing a beanie.

9

While Yanet was in the car, she heard defendant talk about putting a gun away. She saw him take a gun out of his sweater, but she did not see what he did with it. Yanet thought defendant put the gun in the glove compartment because she remembered the glove compartment being opened and she heard defendant and Janet talk about putting a gun in the glove compartment. Yanet saw Janet and defendant walk around to the car door and open the glove compartment, but she did not actually see defendant put the gun in the glove compartment. In her testimony, Yanet admitted she had told police the gun was in the glove compartment.

Yanet testified that Janet did not give her the car keys. Yanet thought Janet gave the keys to Aisha because Janet said she wanted to drink, and because Aisha had the keys after the shooting.

Yanet was outside the house on the lawn when she heard "a bit of a confrontation" and the sound of a bottle breaking. The African-American group started saying "East Palo Alto." Then "the Mexican people said . . . something about San José." Defendant was involved in the confrontation. Yanet saw him put his hands up. At that point, she started walking across the street. She was on the phone trying to find Janet. She joined up with Aisha. As she was walking across the street, she heard gunshots.

Yanet ran to the car, but she could not get in without the keys. Aisha, who was just behind Yanet, unlocked the car and they both got in. Janet and Marcus got in the car soon after. They were about to leave when defendant got in, whereupon they drove away. Defendant was sitting next to Yanet on her right side. He had a black gun. He told Marcus the gun was stuck and asked Marcus for help getting the gun unstuck. Marcus did not want to touch the gun. Janet asked defendant if he shot someone. Defendant responded "no" and said he had shot in the air.

They drove to downtown San José and stayed there for about an hour and a half. Afterward, they drove to Menlo Park. There, Yanet heard Lavell say he needed to wash gunpowder off his hands.

The next day, the police got Yanet's phone number from her parents and called her. When she answered, the police told her they were homicide detectives, but Yanet thought it was a joke. Her father then called to tell her the police had come to the house. When her father called, Yanet was with defendant, Janet, and several others. Yanet told them about her father's call. Defendant told Yanet: "You don't know anything. You don't know any names. You don't know anyone."

The police interviewed Yanet on November 27. They drove her to Menlo Park in an unmarked vehicle. From the unmarked vehicle, Yanet identified Janet, who was driving the Toyota RAV4 they had driven to the party. While the police were driving Yanet to another location, she spotted defendant in another car passing by. She told police that defendant was one of the shooters at the party. The police turned around and followed the car at a distance until it parked at a Chinese restaurant. The police parked nearby. When the passengers of the car got out, Yanet again identified defendant. The police called for backup and stayed nearby to watch the car and its passengers. While they were waiting, a second car pulled up, whereupon Tramel and two other passengers got out. The police arrived later to detain defendant and Tramel.

h. *Other Witnesses*

*Aisha White*—Aisha went to the party with the group of African-American males. She testified that defendant had dreadlocks with the ends dyed blond or brown. One of the other African Americans also had dreadlocks, but his were shorter than defendant's, and the tips were not dyed gold. The entire group went to the party in four vehicles. Aisha rode in Janet's RAV4. Aisha never saw a gun before the party, and she never heard defendant have a discussion with Janet about wanting to put a gun in the glove compartment. Aisha was drinking at the party and "felt kind of funny." She testified that Janet did not give the car keys to her. When she went outside to leave the party, she saw "these big, bigger guys" yelling, and people were yelling "408." Aisha saw defendant and Marcus throw their hands up with their palms out facing frontward, as if to say: "I

11

don't want any trouble." Aisha thought there might be trouble and headed for the cars. When she reached the curb, she heard shots fired behind her, so she started running. At the car, Yanet was trying to unlock the car door, but she was having difficulty because her hands were shaking. When they drove away in Janet's car, Aisha testified that she never saw a weapon, and there was no discussion about a weapon or the shooting. Aisha never talked about the shooting with defendant, Tramel, or Lavell.

*Shaina Hamilton*—Shaina was Janet's best friend. Shaina testified that defendant was the only one in the group of African-American males who had blond-tipped dreadlocks. Shaina drove one of the other cars to the party. Lavell, among others, was in her car. At some point, there was a lot of arguing and yelling at the party, so Shaina went to her car. When she got to the car, she heard gunshots, and they left. Shaina did not see the shooting. The shots came from behind her, and she did not turn to look. They left and drove to downtown San José. After they parked, she was standing next to Janet's car when she saw defendant put a silver gun into Janet's glove compartment.

*Antoine Moore*—Antoine knew defendant "through family." Antoine was at the party when the shooting occurred. He remembered that defendant wore his hair in dreadlocks with gold tips at the time. Antoine testified that he ran out of the house and left the party when gunshots were fired. He testified that he did not see defendant or Tramel do anything, but the prosecution presented the jury with numerous audio excerpts from Antoine's interrogation by police on November 27. In that interrogation, Antoine identified defendant and Tramel as the shooters. Antoine told the police he had seen defendant standing on the sidewalk and Tramel standing in the street when they opened fire. Antoine said defendant fired "like two" rounds.

In his testimony, Antoine admitted that police had interrogated him, but he disavowed the incriminating statements he had given to them. He claimed the police gave him the names of defendant and Tramel and pressured him to identify them as the shooters. When the audio clips of his interrogation were played for the jury, Antoine

12

either denied making the recorded statements or testified that he was scared and confused when he made them.

### i. *Forensic Evidence*

Police found eleven spent shell casings on Carobwood Lane adjacent to the intersection with Madrid Drive. The prosecution's criminalist testified that eight casings came from cartridges with a caliber of 7.62 x 25 millimeters, and three casings came from nine-millimeter cartridges. The two types of casings came from two different guns. The eight 7.62 x 25 millimeter casings were all fired from the same gun. The three nine-millimeter casings were also all fired from the same gun. Based on firing pin impressions on the casings, the criminalist opined the nine-millimeter casings were fired from either a Glock or a Smith & Wesson Sigma. Both are semiautomatic handguns.

Police also recovered several bullets and bullet fragments from the area. Two bullets—including the bullet that struck DeJesús—were consistent with the 7.62 x 25 millimeter casings. Three bullets were .32-caliber bullets. Two of the .32-caliber bullets were fired from a .32-caliber Smith & Wesson revolver that had been found during a warrant search of Lavell's residence. The third bullet was too damaged to match to the revolver.

The criminalist testified that a revolver does not discharge bullet casings; therefore, the casings would not have been left at the scene of the shooting unless they had been removed from the revolver and dumped there. The two bullets consistent with the 7.62 x 25 millimeter casings—including the bullet that struck DeJesús—could not have been fired from either of the guns that discharged the nine-millimeter casings or the .32-caliber bullets. Based on this evidence, the criminalist opined that at least three guns had been used in connection with the casings and bullets found at the scene of the shooting.

13

2. *The November 5 Shooting of Ivan Cruz in Sunnyvale*

On November 5, Layla Almatrood held a party for her sixteenth birthday at her mother's home in Sunnyvale. Layla's mother, Kelly Way, supervised the party. About a hundred people came.

Kelly testified that a "scuffle" broke out between a bunch of "black kids" and "Mexican kids" in the living room. Kelly told them to leave, and they went outside. One of the African-American males was wearing a black sweatshirt with a hood. Once outside, he took off his sweatshirt and had no shirt underneath. They were yelling and screaming. Kelly told them: "You guys shouldn't be doing that." Kelly then heard gunshots, whereupon she went back into the house.

Ivan Cruz was shot in the lower back. The bullet lodged near his spine. Ivan told police he could not provide a detailed description of his assailants. Although a toxicology screen conducted at the hospital tested negative for drugs, Ivan testified that he had drunk a large amount of alcohol, smoked marijuana, and used cocaine that evening, such that he could not recall talking to the police. Ivan did not appear intoxicated at the hospital, and he did not smell of alcohol. In his testimony, Ivan admitted he was a former "Northerner" gang member. Ivan's friend testified that he heard "East Palo Alto" yelled repeatedly during the fight.

Janet, Shaina, Aisha, Antoine, and Tramel were at the Sunnyvale party. Shaina testified that she could not recall if defendant was there. Aisha testified, "I don't remember [defendant] being at the Sunnyvale party at all." Aisha saw Tramel point a dark-colored gun towards the sky during the fight. She heard him say, "I'm going to light this up." Aisha started to leave the party at that point. She heard the gunshots, but did not see them. As they were leaving, Aisha saw a male with a lighter complexion hunched over while holding his midsection.

Janet testified that she thought defendant and Tramel, among others, were involved in the fight. She saw Tramel shoot a gun into the air. She heard a single

14

gunshot, and ran to her car. In her testimony, Janet admitted she had previously told police that defendant had also fired a gun. But she also told police that she did not see defendant shoot a gun, and that she only saw Tramel shooting. She explained to police that she had thought defendant had fired a gun because Aisha had said after the party that she had seen both Tramel and defendant fire guns.

Police found sweatshirts labeled "650 East Palo Alto" and "Bay Area 650 Hustler" at the scene. They also found five nine-millimeter shell casings in the street outside the house. The prosecution's criminalist testified that the casings were fired from a different gun than the nine-millimeter gun used in the November 25 shooting in San José. Police also found a .22-caliber bullet lodged in a neighbor's kitchen cabinet. The criminalist testified that the .22-caliber bullet could not have been fired from the gun that expelled the nine-millimeter casings. He therefore opined that at least two different guns were used in the shooting.

3. *Gang Evidence*

Detective Ed Soares of the Menlo Park Police Department testified for the prosecution as "an expert in the matters of criminal street gangs, particularly those located in Menlo Park and East Palo Alto and particularly the gang known as the Midtown Taliban street gang." Much of Soares' testimony focused on the "Taliban" or "Midtown Taliban" gang in eastern Menlo Park and East Palo Alto. Among other things, Soares opined that: (1) the Taliban constituted a criminal street gang; (2) defendant, Tramel, and Lavell were members of the Taliban; and (3) based on certain hypothetical facts, both the November 5 shooting and the November 25 shooting would have benefitted the Taliban.

Soares testified that the Taliban began in its "infancy stage" with five to ten members around 2005. In 2006, Soares joined an FBI task force focused on a rival street gang in East Palo Alto. In 2008, he joined a federal task force focused on the Taliban in East Palo Alto and Menlo Park. Soares estimated that he had personally arrested more

15

than 50 Taliban members as part of his involvement with the task force. He gained much of his information about the Taliban from his personal interactions with Richard Burns, who admitted being one of the Taliban's founding members. Soares also had personal contacts with Gary Farmer, who was a Taliban member in Soares' opinion.

Soares presented numerous examples of Taliban media displays. He testified that a YouTube video, played for the jury, was partly recorded in front of Richard Burns' house and showed several Taliban members. Soares described the video as showing the Taliban's territory, activities, gang signs, clothing, tattoos, and logos. Rap lyrics accompanying the video described threats of violence and shootings. Soares testified at length about the meaning of other Taliban-related rap songs describing the lifestyle and criminal activities of the Taliban. Soares also testified about numerous photos of Taliban members downloaded from MySpace. He testified that these photos showed Taliban members' identities, clothing styles, slang, hand signals, and tattoos. Soares also testified that Taliban members commonly wore clothing with a green Army camouflage pattern, as did many of the persons in the photos.

The prosecution presented numerous records showing that several Taliban members in the video and photos had been convicted of various crimes, including armed robbery, possession of firearms, assault, distribution of controlled substances, and attempted murder.

On cross-examination, Soares admitted that defendant did not appear in the video, the rap songs, or any of the MySpace photos the prosecution presented. Soares also testified that, in all of the conversations he had with gang members over the years, none of them had ever mentioned defendant. Defendant had no gang-related tattoos, and Soares had never seen defendant throw a gang sign, either in person or in photos. Soares could not locate any gang "field identification cards" connected with defendant. And he had never seen defendant making or standing near gang graffiti. Soares was not aware of

16

any moniker connecting defendant to the Taliban, and he had never seen defendant, in person or in photos, wearing camouflage clothing.

Soares nonetheless cited several factors to support his opinion that defendant was a Taliban member. First, he relied on defendant's associations with other gang members. For example, in March 2005, defendant and Tramel had been the victims of a drive-by shooting in Taliban territory. Afterward, Soares saw Gary Farmer at the hospital waiting to see defendant. Second, defendant wrote a letter from jail to Gary Farmer in May 2008. The letter contained no "gang talk," but it referred to another Taliban member who was defendant's cousin. Defendant had also been seen on several occasions with Wilbert Ard, another known Taliban member. Finally, Soares based his opinion that defendant was a Taliban member on evidence showing that defendant participated in the November 5 and November 25 shootings.

Based on hypothetical scenarios similar to the evidence presented in this case, Soares opined that both shootings would have benefitted the Taliban by instilling respect for the gang in bystanders and others who heard about the shootings. He opined that the commission of violent acts and the use of guns, together with yelling "EPA" or "Taliban" at the scene of the shooting, would have reinforced the gang's reputation as dangerous. He further opined that defendant's participation in the shootings would have elevated his standing within the Taliban by demonstrating bravado and a willingness to defend the gang.

4. *Other Prosecution Evidence*

On November 28, police conducted a warrant search of Lavell's residence. They recovered a revolver matching two of the .32-caliber bullets found at the scene of the November 25 shooting. Fingerprints on the gun could not be matched to defendant, Lavell, or Tramel. Investigators ruled out defendant, Lavell, and Tramel with respect to one of the fingerprints, but they could not identify any other person matching that print. Police also found a red backpack containing school-related paperwork, three pages of

17

which bore Lavell's name. Writing on the backpack included the words "Taliban" and "Midtown," among others.

The same day, police interrogated defendant in custody. At trial, the prosecution played a redacted video recording of the interview for the jury. During that interview, defendant repeatedly denied he was at the party on November 25. He claimed he had gone to the mall; to his aunt's house in Menlo Park; and to a friend's house that evening. He also claimed that Tramel was with him.

In March 2006, defendant wrote a letter to the district attorney. Among other things, the letter stated that Tramel was not involved in the November 25 shooting. The letter claimed Tramel "never was around the argument that occurred with a group of latinos" and that "[w]hen the shooting occurred [Tramel] was already in the car leaving. He didn't know that anyone he arrived with at the party was carrying a firearm."

5. *Defense Evidence*

Defendant's only witness was Dr. Deborah Davis, an expert in "the fields of eyewitness and memory evaluation and interrogation techniques." Dr. Davis testified about how memory and perception affect the accuracy and reliability of eyewitness identifications and statements made in interrogations. She testified that eyewitness testimony and identifications are often inaccurate, and that people tend to place an unwarranted amount of weight on such testimony. She summarized the results of laboratory studies and experiments showing that people frequently make mistakes in eyewitness identifications and facial recognition. She also discussed studies showing that the presence of a gun in a given situation increases the frequency of mistakes in eyewitness identifications. With respect to interrogations, she testified that subjects of interviews are more likely to make unreliable statements when the interview is conducted in a coercive manner. She further testified to factors that can result in failures of memory, such as certain group dynamics, absent-mindedness, the failure to pay specific attention to certain things, and the presence of extreme stress.

18

B. *Procedural Background*

The prosecution initially charged defendant jointly with Tramel and Lavell in connection with both shootings. In 2009, the trial court granted the prosecution's motion to sever defendant's trial from that of his codefendants. Lavell pleaded no contest to one count of voluntary manslaughter and admitted to firearm and gang enhancements in exchange for a 20-year prison term. Tramel was sentenced to a 25-year term for voluntary manslaughter and shooting at an inhabited dwelling, both with firearm and gang enhancements.

In March 2010, the prosecution filed a second amended information (the operative charging document) alleging four counts: Count One—the November 25 murder of DeJesús in San José (Pen. Code, § 187); Count Two—shooting at an inhabited dwelling in San José on November 25 (Pen. Code, § 246); Count Three—assault with a firearm upon Ivan Cruz in Sunnyvale on November 5 (Pen. Code, § 245, subd. (a)(2)); and Count Four—shooting at an inhabited dwelling in Sunnyvale on November 5 (Pen. Code, § 246). As to each count, the information alleged firearm and gang enhancements. (Pen. Code, §§ 12022.5, subd. (a), 12022.53, subds. (b)-(d), § 186.22, subds. (b)(1)(C) & (b)(4).) As to Counts One, Two, and Four, the information alleged defendant was a principal. (Pen. Code, § 12022.53, subd. (e)(1).) Defendant was charged as an adult. (Welf. & Inst. Code, § 707, subd. (d)(1).)

Jury selection began January 4, 2010, and the parties presented opening statements on February 3, 2010. Closing arguments were completed on April 3, 2010, and the jury began deliberating on April 7. The jury deliberated for fourteen days. The trial court replaced two jurors with alternate jurors during deliberations.

On April 29, 2010, the jury found appellant guilty of second degree murder on Count One and shooting at an inhabited dwelling on Count Two. The jury hung on Counts Three and Four and returned no findings on any of the enhancements. The trial court declared a mistrial as to Counts Three and Four and all enhancements. As to

19

Counts Three and Four, nine jurors voted guilty and three voted not guilty. As to the firearm enhancement on Count One, eleven jurors voted true and one juror voted not true. As to all remaining enhancements on Counts One and Two, ten jurors voted true, and two jurors voted not true.

The trial court sentenced defendant to an aggregate term of 22 years to life, composed of 15 years to life for Count One consecutive to seven years for Count Two.

## II. DISCUSSION

### A. *Sufficiency of the Evidence*

Defendant contends the convictions on both counts were based on insufficient evidence in violation of his state and federal constitutional rights. He argues that none of the prosecution's eyewitnesses established that he fired a gun in the course of the November 25 shooting. He also argues that the prosecution's witnesses did not identify him as one of the shooters, and that the evidence failed to establish that he fired the gun that killed DeJesús. Defendant characterizes the testimony of the prosecution's eyewitnesses as circumstantial, and he challenges their credibility on the grounds that they were biased and unreliable.

The Attorney General argues that overwhelming evidence shows defendant personally fired a gun at an inhabited dwelling, but that such a finding was not necessary to support his convictions. The Attorney General also argues that the jury could have convicted defendant on both counts under theories of aiding and abetting, conspiracy, and the doctrine of natural and probable consequences.

We conclude sufficient evidence supported the convictions on both counts.

### 1. *Legal Principles*

#### a. *Standard of Review*

In reviewing a claim of insufficient evidence, we review the whole record in the light most favorable to the prosecution to determine whether the record discloses substantial evidence to support the conviction. (*People v. Halvorsen* (2007) 42 Cal.4th

20

379, 419.)  "Substantial evidence" is evidence that is "reasonable, credible, and of solid value" such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)  "An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise."  (*People v. Combs* (2004) 34 Cal.4th 821, 849.)  Similarly, under the federal constitution, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

b.  *Second Degree Murder*

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought."  (Pen. Code, § 187, subd. (a).)  California law recognizes three theories of second degree murder:  unpremeditated murder with express malice, implied malice murder, and second degree felony murder.  (*People v. Swain* (1996) 12 Cal.4th 593, 601.)  Express malice exists "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature."  (Pen. Code, § 188.)  Malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."  (*Ibid.*)  "Second degree felony murder is 'an unlawful killing in the course of the commission of a felony that is inherently dangerous to human life but is not included among the felonies enumerated in section 189 . . . .' " (*People v. Chun* (2009) 45 Cal.4th 1172, 1182 (*Chun*) [quoting *People v. Robertson* (2004) 34 Cal.4th 156, 164, overruled on other grounds by *Chun*].)  If the underlying felony is assaultive in nature—e.g., shooting at an occupied vehicle—the felony merges with the homicide and cannot be the basis of a felony-murder instruction.  (*Chun*, at p. 1200.)

c. *Shooting at an Inhabited Dwelling*

As relevant here, Penal Code section 246 prohibits "maliciously and willfully discharg[ing] a firearm at an inhabited dwelling house . . . ." (Pen. Code, § 246.) "The elements of this offense are (1) acting willfully and maliciously, and (2) shooting at an inhabited house." (*People v. Ramirez* (2009) 45 Cal.4th 980, 985.) "[T]he term 'maliciously' in section 246 is defined by Penal Code section 7, item 4, as 'a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law.' " (*People v. Watie* (2002) 100 Cal.App.4th 866, 879.) Courts have construed the term "malicious" not to require specific intent. (*People v. Atkins* (2001) 25 Cal.4th 76, 85.) "It is settled that a violation of section 246 is a general intent crime." (*People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1500 (*Hernandez*).) The only intent required is "the purpose or willingness to do the act . . . ." (*Hernandez*, *supra*, at p. 1500.) Furthermore, "section 246 is not limited to the act of shooting directly 'at' an inhabited or occupied target. Rather, the act of shooting 'at' a proscribed target is also committed when the defendant shoots in such close proximity to the target that he shows a conscious indifference to the probable consequence that one or more bullets will strike the target or persons in or around it. The defendant's conscious indifference to the probability that a shooting will achieve a particular result is inferred from the nature and circumstances of his act." (*People v. Overman* (2005) 126 Cal.App.4th 1344, 1356-1357 (*Overman*).)

d. *Theories of Indirect Liability*

The trial court instructed the jury on indirect liability through aiding and abetting, conspiracy, and the doctrine of natural and probable consequences. Penal Code section 31 extends liability as principals in a crime to "[a]ll persons concerned in the commission of a crime," and all those who "aid and abet in its commission." (Pen. Code, § 31.) "If the defendant himself commits the offense, he is guilty as a direct perpetrator. If he assists another, he is guilty as an aider and abettor." (*People v. Perez* (2005)

22

35 Cal.4th 1219, 1225.) "[A]n aider and abettor's guilt 'is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state. [Citation.] ' "[O]nce it is proved that 'the principal has caused an actus reus, the liability of each of the secondary parties should be assessed according to his own mens rea.' " ' [Citation.] Thus, proof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*Ibid.*) Such conduct exists when the aider or abettor "by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)

" 'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor actually foresaw the additional crime, but whether, judged objectively, it was reasonably foreseeable. [Citation.]' [Citation.] Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' [Citation.] '[A]lthough variations in phrasing are found in decisions addressing the doctrine—'probable and natural,' 'natural and reasonable,' and 'reasonably foreseeable'—the ultimate factual question is one of foreseeability.' [Citation.] Thus, ' "[a] natural and probable consequence is a foreseeable consequence". . . .' [Citation.] But 'to be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough . . . ." [Citation.]' [Citation.] A reasonably

23

foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury. [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 920.)

"It is long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator." (*People v. Belmontes* (1988) 45 Cal.3d 744, 788 [disapproved of on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390].) "A criminal conspiracy exists where it is established that there was an unlawful agreement to commit a crime between two or more people, and an overt act in furtherance of the agreement. [Citation.] To sustain a conviction for conspiracy the prosecution must show not only that the conspirators intended to agree but also that they intended to commit the elements of the offense. [Citation.] In proving a conspiracy, however, it is not necessary to demonstrate that the parties met and actually agreed to undertake the unlawful act or that they had previously arranged a detailed plan. The evidence is sufficient if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. Therefore, conspiracy may be proved through circumstantial evidence inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citation.]" (*People v. Prevost* (1998) 60 Cal.App.4th 1382, 1399.) "[E]ach member of a conspiracy is criminally responsible for the acts of fellow conspirators committed in furtherance of, and which follow as a natural and probable consequence of, the conspiracy, even though such acts were not intended by the conspirators as a part of their common unlawful design." (*People v. Zielesch* (2009) 179 Cal.App.4th 731, 739.)

2. *Procedural Background*

The trial court instructed the jury on both express and implied malice theories of second degree murder.[4]  As to aiding and abetting, the court instructed the jury that defendant could be found guilty of murder if the jury found he intended to aid and abet any one of several target offenses—including, as relevant here, shooting at an inhabited dwelling.  The court also instructed the jury that to find defendant guilty of murder under this theory, the prosecution had to prove he was guilty of the target offense; that a co-participant in the target offense committed murder; and that the commission of murder was a natural and probable consequence of the target offense.  And the court instructed the jury that a natural and probable consequence "is one that a reasonable person would know is likely to happen if nothing unusual intervenes."  Finally, the court instructed the jury on conspiracy liability, including a conspirator's liability for the natural and probable consequences of acts by coconspirators in furtherance of the conspiracy.

3. *Sufficient Evidence Supported the Convictions*

The central thrust of defendant's argument is that the jury had insufficient evidence to establish his identity as one of the shooters.  We disagree.

First, the witnesses who personally knew defendant—Janet, Yanet, Aisha, Shaina, and Antoine—consistently described him as having gold- or blond-tipped dreadlocks at the time of the shooting.  Janet, Yanet, Aisha, and Shaina all testified that defendant was the only member of their group with that hairstyle.  One of the partygoers—Matthew Tracy—specifically saw an African-American male with blond- or gold-tipped dreadlocks point and fire a gun at the house.  Gilbert Guel, another partygoer, saw two African Americans with dreadlocks firing multiple gunshots at the house.  He testified

---

[4] The trial court did not instruct the jury on felony murder.  Defendant contends the trial court instructed the jury in a manner that allowed it to convict him on a theory of felony murder, but we reject this claim below in Section II.I.2.

that he did not know what color the dreadlocks were, but he admitted he had told the police that one of the shooters had dreadlocks with yellow tips.

The witnesses who personally knew defendant also implicated him in the shooting. Janet told the police defendant took a gun out of his jeans pocket and put it in her glove compartment before the party. Yanet testified that she saw defendant with a gun in the car, and she heard him talk about putting it away. During the shooting, Janet saw defendant crouched down with both arms extended toward the house. Yanet testified that when they were in the car after the shooting, Janet asked defendant if he had shot anyone, whereupon defendant responded that he had not, and that he had merely shot into the air. After they drove to downtown San José, Shaina saw defendant put a gun into the glove compartment of Janet's car. Finally, in his police interrogation, Antoine specifically identified defendant by name as one of the shooters. Antoine told the police he saw defendant standing on the sidewalk when defendant and Tramel opened fire. Although Antoine disavowed his prior statements to police when he testified, the jury—who heard the audio recording of the interrogation—reasonably could have discredited Antoine's in-court denials while crediting the statements in his police interview.

Defendant argues that the testimony of Yanet and Shaina was unreliable. He points to sources of potential bias and conflicts in their testimony as compared with their prior statements and other evidence. Regarding statements to police made by Antoine and Janet, defendant argues they were tainted by interrogation tactics whereby the officers provided the witnesses with facts about the offenses and pressured them into making incriminating statements. We conclude that none of this testimony was so unreliable or unbelievable that a rational jury could not have credited it. Our role as a court of review requires us to defer to the jury's judgment as to the credibility of witnesses and to the jury's resolution of evidentiary conflicts so long as substantial evidence supports their verdicts. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

26

The prosecution presented substantial evidence from which the jury could find beyond a reasonable doubt that defendant fired one or more gunshots directly at the San José house or in such close proximity to the house as to show "a conscious indifference to the probable consequence that one or more bullets w[ould] strike the target or persons in or around it." (*Overman*, *supra*, 126 Cal.App.4th at pp. 1356-1357.) Furthermore, the jury could have concluded from this evidence that defendant acted willfully and maliciously. Thus, the evidence was sufficient to support the jury's conviction on Count Two for shooting at an inhabited dwelling in San José.

We agree with defendant that the prosecution presented no evidence from which the jury could conclude that he fired the shot that killed DeJesús. The evidence showed DeJesús was struck by a single .30-caliber bullet consistent with 7.62 x 25 millimeter casings found in the street next to the house. But the evidence also established that at least three different guns were discharged during the incident. While substantial evidence showed that defendant fired a gun in the direction of the partygoers, the prosecution presented no evidence showing defendant fired the fatal .30-caliber bullet.

However, the jury was not required to find defendant fired the fatal shot to convict him of second degree murder. The jury could have convicted defendant as an aider and abettor or as a coconspirator. The prosecution emphasized these theories of liability in closing argument. Specifically, the prosecution argued that defendant could be guilty as an aider and abettor even if he did not fire the fatal shot because his act of firing a weapon alongside the actual perpetrator encouraged and emboldened the actual perpetrator to fire the fatal shot. The prosecution presented sufficient evidence to support this theory. Janet and Yanet, for example, gave testimony from which the jury could have found defendant possessed a gun before the party, which he put in the glove compartment of Janet's car. Matthew testified that, after the argument between the African-American males and the partygoers, an African American with blond-tipped dreadlocks and another African-American male went to one of their cars in the street,

27

after which they returned to the street in front of the party wielding firearms. The jury could have found defendant was one of those persons, and that, in doing so, defendant encouraged his coparticipant to return to the street in front of the party with a gun. Furthermore, the jury could have found defendant was aware his coparticipant possessed a gun as they returned to the area in front of the party.

Matthew also testified that, after the African-American males returned to the street in front of the house, the African-American male with the blond-tipped dreadlocks pointed his gun at the house and told everyone to "clear out." The jury could have found that defendant performed those actions, and that his actions encouraged and emboldened the actual perpetrator of the murder to point his gun at the party. Matthew testified that he then heard multiple gunshots, and saw the muzzle flash from the gun held by the African American with blond-tipped dreadlocks. Matthew also heard gunshots of a different caliber. Furthermore, Antoine's statements to police—that he witnessed defendant and Tramel firing their guns multiple times—corroborated Matthew's testimony. Again, the jury could have found that defendant, while standing alongside his coparticipants, discharged his weapon multiple times while the actual perpetrator who shot DeJesús fired multiple shots at the same time. A rational jury could have concluded that defendant's actions encouraged and emboldened his coparticipants to fire upon the partygoers, causing the death of DeJesús.

This evidence was sufficient to support a rational jury's finding that defendant possessed the requisite mens rea as an aider and abettor—that is, that he knew the perpetrator intended to shoot at the partygoers, and that defendant intended to encourage the perpetrator to do so. And a rational jury also could have concluded that the perpetrator's murder of a partygoer was a reasonably foreseeable consequence of shooting at an inhabited dwelling. (See *People v. Karapetyan* (2006) 140 Cal.App.4th 1172 [murder was a natural and probable consequence of an assault where defendant and others, with weapons at their disposal, attacked a lone unarmed victim].)

28

Defendant points to the jury's failure to return a finding on the allegations that he personally and intentionally discharged a firearm in the commission of the offenses. (Pen. Code, § 12022.53, subds. (b)-(d) & (e)(1).)  But Penal Code section 954 provides, in part:  "An acquittal of one or more counts shall not be deemed an acquittal of any other count." (Pen. Code, § 954.)  "It is well established that, under section 954, inconsistent verdicts are allowed to stand if the verdicts are otherwise supported by substantial evidence." (*People v. Miranda* (2011) 192 Cal.App.4th 398, 405.)  "The rule applies equally to inconsistent enhancement findings [citation], and to an enhancement finding that is inconsistent with the verdict on a substantive offense [citation]." (*Ibid.*)  Thus, even if the jury had returned not true findings on the firearm enhancements, defendant's convictions would still stand, given substantial evidence for them.  For these reasons, we reject defendant's claims of insufficient evidence as to his convictions on Counts One and Two.

B. *Admission of Defendant's Statements to Police*

Defendant contends the trial court erred by failing to suppress the entirety of his in-custody statements to police in violation of his constitutional rights under Article I of the California Constitution and the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.  Although the interrogating officers advised defendant of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), he argues he did not enter a valid waiver of his rights before continuing to answer the officers' questions.

We conclude defendant validly waived his *Miranda* rights and that the trial court properly admitted a portion of his statements into evidence.

1. *Factual Background*

The police arrested defendant between 10:30 p.m. and 11:30 p.m. on November 27.  Defendant at that time was about two weeks shy of his eighteenth birthday.  The police took him to the San José Police Department and two officers interrogated him in a homicide interview room.  The interrogation began at 1:50 a.m. and

29

lasted approximately an hour and a half. The officers removed defendant's handcuffs before the interview and offered him food and drink. Defendant appeared groggy, yawned several times, and sat slumped over in his chair for much of the interview. One of the officers later testified that defendant "seemed nervous."

The officers questioned defendant for approximately five minutes before reading his *Miranda* rights to him. In this pre-*Mirandized* questioning, the officers asked defendant his full name, his home address, his phone numbers, date of birth, social security number, and other personal details. They told defendant they had contacted his mother.[5]

One of the officers then *Mirandized* defendant. The video shows defendant looking at the officers throughout the advisement. When told of his right to remain silent, defendant nodded slightly and responded: "Um hum." When told that his statements could be used against him, that he had the right to an attorney, and that an attorney would be appointed free of charge, defendant responded "[u]m hum" to each advisement. The officers did not explicitly ask defendant whether he wished to waive these rights, and he did not explicitly state that he was doing so.

The officers then questioned defendant about his whereabouts on the evening of the offense. Defendant told the officers he went to the mall, then to a relative's house, and then to a friend's house. When officers questioned him about the party, defendant repeatedly denied being at the party. The officers insisted they knew he was at the party and told him: "Listen, you killed somebody." Defendant denied killing anyone and continued to deny that he was at the party.

After 25 minutes of questioning, defendant asked to speak with his mother. The officers continued to question him, but after he repeated his request several times, they took him to another room and allowed him to call his mother. Police remained in the

---

[5] Defendant contends the police were lying when they told him they had contacted his mother. The record does not support this assertion.

30

room and recorded defendant's statements to his mother. At the end of the call, the police resumed the interrogation. Defendant continued to deny his involvement. After the interrogation, the police booked defendant into Juvenile Hall.

2. *Procedural Background*

The prosecution moved in limine for the admission of defendant's in-custody statements. At oral argument, defendant objected on the grounds that he never validly waived his *Miranda* rights and that his requests to speak with his mother constituted an implicit invocation of the right to counsel. The prosecution conceded "out of an abundance of caution" that defendant's request to speak with his mother constituted a request for counsel. Accordingly, the prosecution sought admission of defendant's statements made prior to that request. The prosecution also sought to admit statements defendant made to his mother on the phone on the ground that they were not part of the interrogation.

After receiving testimony from one of the interrogating officers, the trial court made several factual findings. The court found: (1) defendant was a juvenile who was "unsophisticated with respect to the law" and "not well educated for his age" at the time of the interview; (2) defendant was very tired before the interview; and (3) defendant had repeatedly yawned, put his head down, and rubbed his eyes. Nonetheless, the court found that defendant, when *Mirandized*, had acknowledged he understood his rights. But the court also found that defendant's requests to speak with his mother constituted an invocation of counsel. Accordingly, the court granted the prosecution's motion to admit the statements made prior to defendant's first request to speak with his mother. The court excluded all subsequent statements, including those defendant made to his mother on the telephone.

At trial, the prosecution presented a video recording of defendant's pre-invocation statements through the testimony of one of the interrogating officers. In closing argument, the prosecution argued that defendant lied during the interview because "the

31

accused can't tell the truth."  The prosecution also accused defendant of "covering for Tramel."

      3.  *Legal Principles*

      The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself . . . ."  (U.S. Const., 5th Amend.)  The privilege against self-incrimination is "available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way . . . ."  (*Miranda*, *supra*, 384 U.S. at p. 467.)  "[T]he accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored."  (*Ibid.*)  " '[A] suspect [may] not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and, if indigent, to appointed counsel.'  [Citations.]  After a knowing and voluntary waiver, interrogation may proceed ' "until and unless the suspect clearly requests an attorney." ' "  (*People v. Dykes* (2009) 46 Cal.4th 731, 751 (*Dykes*).)

      "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."  (*Miranda*, *supra*, 384 U.S. at p. 475.)  "[T]he determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel.  [Citation.]  This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved."  (*Fare v. Michael C.* (1979) 442 U.S. 707, 724-725.)  The analysis includes evaluation of the juvenile's age, experience, education, background, intelligence, and capacity to

32

understand the *Miranda* warnings and effect of the confession.  (*Ibid.*; *People v. Lara* (1967) 67 Cal.2d 365, 385-387.)

In reviewing a claim on appeal that a statement was admitted in violation of a defendant's *Miranda* rights, we independently review the trial court's legal determinations.  (*Dykes*, *supra*, 46 Cal.4th at p. 751.)  We accept the trial court's factual findings regarding the circumstances of the defendant's statements if the findings are supported by substantial evidence.  (*Ibid.*)

4.  *Defendant Validly Waived His Miranda Rights*

Defendant contends the totality of the circumstances shows he did not validly waive his *Miranda* rights.  He points to his young age, his lack of sophistication, his mental state, the nature of the officers' questioning, and the lack of an express waiver.

We conclude defendant understood the *Miranda* warnings and implicitly waived his rights by voluntarily continuing to answer the officers' questions.  Although defendant was a juvenile, he was nearly eighteen.  And while he was unsophisticated, there was no evidence he suffered from any mental or intellectual disability severe enough to impair his understanding of the warnings.  Nor was there any overt or visual indication that he was "confused, misled, or reluctant to talk . . . ."  (*People v. Nitschmann* (1995) 35 Cal.App.4th 677, 682.)  Despite being tired, defendant clearly paid attention to the officers during the advisements.  When advised of his right to remain silent, defendant indicated he understood by nodding slightly and responding "Um hum." Similarly, he responded "[u]m hum" to the remaining warnings.  Although he did not use the words "yes" or "I understand," the sound of his voice, together with his initial nod, demonstrated that his responses were unambiguously affirmative.

As to the lack of an express waiver, the United States Supreme Court has declined to require an express waiver.  "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver."  (*North*

33

*Carolina v. Butler* (1979) 441 U.S. 369, 373.) "[I]n at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." (*Ibid.*, fn. omitted.) California law is in accord with this principle. (*People v. Whitson* (1998) 17 Cal.4th 229, 247-248.) Waiver may be inferred from the fact that a defendant continues to answer questions willingly. "Once the defendant has been informed of his rights, and indicates that he understands those rights, it would seem that his choosing to speak and not requesting a lawyer is sufficient evidence that he knows of his rights and chooses not to exercise them." (*People v. Johnson* (1969) 70 Cal.2d 541, 558 [disapproved on other grounds by *People v. Devaughn* (1977) 18 Cal.3d 889].)

Under the totality of the circumstances, we conclude defendant understood the *Miranda* advisements and validly waived his privilege against self-incrimination. We thus conclude the trial court properly admitted the statements defendant made prior to his request to speak with his mother.

C. *Admission of Expert Testimony on the Taliban Criminal Street Gang*

Defendant contends the trial court erred by admitting expert testimony on the Taliban criminal street gang in violation of state law rules of evidence and his constitutional rights under Article I of the California Constitution and the Fifth, Sixth and Fourteenth Amendments of the United States Constitution. Defendant puts forth five specific claims in this category: (1) the prosecution's gang expert was unqualified; (2) the expert's opinions were irrelevant and prejudicial; (3) the expert's opinions were based on unreliable methods and information; (4) the expert impermissibly opined on defendant's intent and guilt; and (5) the trial court erred by admitting testimonial hearsay through the expert in violation of *Crawford*, *supra*, 541 U.S. 36. Except for the last claim, we conclude these arguments are without merit. As to the *Crawford* violation, we conclude the trial court erred but the error was harmless.

1. *The Prosecution's Gang Expert Was Qualified*

Defendant challenges the qualifications of the prosecution's gang expert, Ed Soares, on the grounds that he had no training in sociology, anthropology, or psychology relevant to criminal street gangs; he had no contact with the Taliban or defendant in 2005; he was not promoted to detective until 2007, when he was assigned to a federal investigation of the Taliban; and his methods were flawed. We conclude the trial court did not abuse its discretion by qualifying Soares as an expert on the Taliban.

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720.) "The trial court's determination of whether a witness qualifies as an expert is a matter of discretion and will not be disturbed absent a showing of manifest abuse." (*People v. Bolin* (1998) 18 Cal.4th 297, 321-322.)

Soares gave abundant testimony setting forth his training and experience in investigating gangs, including the Taliban and their rival gangs in the area. Soares, a detective for the city of Menlo Park, was assigned to oversee all gang-related crimes in Menlo Park and East Palo Alto. He had been working as a beat officer in the East Palo Alto area since 2002. He estimated that he had made about a thousand contacts with various gang members and more than a hundred arrests—including dozens of Taliban members—while patrolling his beat. Through his contacts, he learned about gang members' histories, clothing, graffiti, hand gestures, lifestyles, and culture.

In 2006, Soares joined a federal task force to investigate gangs in the area, including the Taliban. He testified about the details of his gang-related training, including several conferences and courses conducted by the Department of Justice, the FBI, and California law enforcement agencies. He read various newspapers, magazines, arrest reports, emails, and monthly publications about gang activity from other gang investigators and law enforcement associations. He met regularly with other law

enforcement personnel as part of the San Mateo Gang Intelligence Unit, a clearinghouse for information about gangs collected by law enforcement around the country.

Soares' training and experience provided adequate grounds on which the trial court could qualify him as an expert. (See *People v. Montes* (2014) 58 Cal.4th 809, 861 [based on officer's experience, training, and specific knowledge of the gang involved, the trial court did not abuse its discretion in allowing him to testify as a gang expert].) We find no abuse of discretion as to this claim.

2. *The Trial Court Did Not Abuse Its Discretion Under Evidence Code Sections 210 and 352*

Defendant contends the gang expert's opinions were irrelevant because the prosecution failed to present substantial evidence showing defendant actively participated in the Taliban gang. He further contends the trial court erred by admitting the gang expert's testimony because its probative value was substantially outweighed by the danger of undue prejudice under Evidence Code section 352 (Section 352). We conclude the trial court did not abuse its discretion by admitting the gang expert's opinions.

" 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The test of relevance is whether the evidence tends logically, naturally, and by reasonable inference to establish material facts such as identity, intent, or motive. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1058.) We review for abuse of discretion a trial court's admission of evidence as relevant. (*Id.* at p. 1057.) But even relevant evidence must be excluded if the danger of undue prejudice substantially outweighs its probative value.

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." (Evid. Code, § 352.) " 'The prejudice which [Section

36

352] is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. [Citation.]' [Citation.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 958.) A trial court has broad discretion in determining whether to admit or exclude evidence under Section 352. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1170.) Rulings under Section 352 will not be overturned absent an abuse of that discretion. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.)

Defendant was charged in connection with two shootings. As to all four counts, the prosecution alleged the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang. (Pen. Code, § 186.22, subds. (b)(1)(C) & (b)(4).) Based on hypothetical questions, Soares opined the shootings would have benefited the Taliban by instilling fear and respect for the gang in bystanders and others who heard about the shootings. Thus, Soares' opinions were directly relevant to the gang allegations under Penal Code section 186.22. Furthermore, the probative value of Soares' testimony was supported by other evidence.

Defendant contends Soares testimony lacked probative value because the prosecution presented little or no evidence connecting him or the offenses to the Taliban. We agree with defendant there was minimal evidence of his participation in the Taliban, but the prosecution was not required to show defendant was a current or active participant in a criminal street gang to prove the enhancement under subdivision (b) of Penal Code section 186.22.[6] (*People v. Bragg* (2008) 161 Cal.App.4th 1385, 1402; *In re Ramon T.* (1997) 57 Cal.App.4th 201, 207.) Instead, the prosecution was required to show the

---

[6] Defendant cites to cases construing Penal Code section 186.22, subdivision (a) (defining the substantive offense of actively participating in a criminal street gang) for the proposition that gang expert testimony is relevant only if the prosecution shows the defendant actively participated in a gang. But subdivision (a) of the statute is not at issue here; thus, the cases cited by defendant are irrelevant.

offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang. Accordingly, the prosecution presented substantial evidence to show the shootings benefitted the Taliban. Matthew Tracy testified that the African-American males told him they were from East Palo Alto and asked if gang signs and colors were permitted when they arrived at the party in San José. Witnesses testified that the African Americans threw gang signs and yelled "Taliban up," "This is EPA," and "East Palo Alto" just before the shootings. The prosecution also presented evidence showing Lavell was a Taliban member, including a backpack belonging to Lavell with "Taliban" and "Midtown" written on it. Police found sweatshirts reading "650 East Palo Alto" and "Bay Area 650 Hustler" at the scene of the November 5 shooting. Wilbert Ard, another Taliban member, was involved in the initial confrontation between the African Americans and Latinos at the November 5 shooting. And the victim of that shooting, Ivan Cruz, was also a former gang member.

Given this evidence, the probative value of the gang expert testimony was significant. We conclude the trial court did not abuse its discretion under Evidence Code sections 210 and 352 by admitting the expert's opinions.

3. *Bases for the Gang Expert's Opinions*

Defendant contends Soares' opinions were not based on reliable methods and information. He argues that Soares' methods—which were admittedly subjective—could not be tested; were not subject to any peer review; had no known rate of error; employed no reliable procedural standards; and had no general acceptance in the scientific community. He also argues that the facts Soares relied on—such as the drive-by shooting of defendant in March 2005 and defendant's letter to Gary Farmer in May 2008—were irrelevant to Soares' opinions because the facts did not occur during the same time frame as the shootings. We conclude the trial court did not abuse its discretion by allowing Soares' opinion testimony.

38

Evidence Code section 801 provides, in part, that an expert's opinion must be "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ." (Evid. Code, § 801, subd. (b).) "[A]ny material that forms the basis of an expert's opinion testimony must be reliable." (*People v. Gardeley* (1996) 14 Cal.4th 605, 618 (*Gardeley*).) "[A] gang expert may rely upon conversations with gang members, on his or her personal investigations of gang-related crimes, and on information obtained from colleagues and other law enforcement agencies." (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1121-1122 (*Hill*).) We review the trial court's admission of expert opinion testimony for abuse of discretion. (*People v. Williams* (1997) 16 Cal.4th 153, 197.)

The factors cited by defendant to challenge the gang expert's methods are set forth in *People v. Kelly* (1976) 17 Cal.3d 24, and *Frye v. United States* (1923) 293 F. 1013. However, "*Kelly/Frye* only applies to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is new to science and, even more so, the law." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1156.) Defendant cites no authority excluding nonscientific gang expert testimony based on these factors. To the contrary, courts have routinely admitted gang expert testimony based on the same methods and types of information relied on by Soares. (*Hill*, *supra*, 191 Cal.App.4th at pp. 1121-1122.) Nor does defendant cite any authority for the proposition that an expert's opinion must be based solely on facts that occurred at or near the time of the charged offenses. We conclude the trial court did not abuse its discretion under Evidence Code section 801 by admitting Soares' expert testimony.

4. *Exclusion of Defense Questioning on the CalGang Gang Database*

Defendant raises another claim indirectly challenging the reliability of Soares' opinions. During voir dire, defendant attempted to question Soares about whether he had compared his observations with any centralized database of gang information. The prosecution objected on the ground that defendant was seeking to question Soares about the CalGang database, which the prosecution described as a privileged and confidential database holding gang-related information collected by law enforcement agencies statewide.[7] On questioning outside the presence of the jury, Soares testified that he did not rely on any information from the database in forming his opinions. The prosecution argued that questions about the CalGang database were irrelevant. Defendant then argued that such questions were relevant because they showed Soares had failed to use any objective criteria or "measure stick" to test the reliability of his opinions. The trial court excluded questions about the database under Section 352 after finding that the probative value of such information was low. The court emphasized that the issue before the court was whether Soares was qualified to testify as an expert. The court found that nothing in Evidence Code section 801 would require a gang expert to use a database to be qualified as an expert.

Defendant argues that the trial court erred by excluding his questions about the Calgang database. Since the expert did not rely on the database to form his opinions, we conclude the trial court did not abuse its discretion by excluding questions on that topic.

5. *The Gang Expert Did Not Testify Impermissibly on Intent and Guilt*

Defendant argues that Soares, in response to hypothetical questions posed by the prosecution, testified impermissibly about ultimate issues of fact constituting prejudicial legal conclusions on defendant's guilt and intent. We conclude Soares testified permissibly in response to hypothetical questions.

---

[7] See <http://oag.ca.gov/calgang> [as of Oct. 15, 2015].

"Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.)  But "[a] witness may not express an opinion on a defendant's guilt. [Citation.]  The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue.  [Citations.]  'Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact.  To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.'  [Citation.]"  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.)

"Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[ ] criminal street gang' within the meaning of section 186.22(b)(1)."  (*People v. Albillar* (2010) 51 Cal.4th 47, 63.)  The California Supreme Court has held that a prosecutor may present such evidence through the use of hypothetical questions.  But the "[u]se of hypothetical questions is subject to an important requirement.  'Such a hypothetical question must be rooted in facts shown by the evidence . . . .' "  (*People v. Vang* (2011) 52 Cal.4th 1038, 1045 (*Vang*) [quoting *Gardeley*, *supra*, 14 Cal.4th at p.  618].)  A gang expert presented with such hypothetical facts may opine that the offense was committed for the benefit of a criminal street gang.  Our high court specifically rejected the contention that expert testimony based on hypothetical facts, when "thinly disguised" to resemble the defendant's circumstances, constitutes inadmissible testimony on intent.  (*Vang*, *supra*, at p. 1041.)

Here, the prosecutor asked Soares to assume certain background facts—e.g., that Lavell had a backpack with his name and "Taliban" written on it; that defendant was associated with Gary Farmer in March 2005 when defendant and Tramel were shot in Taliban territory; that defendant was associating with other Taliban members in November 2005; that defendant wrote a letter to Gary Farmer; and several other facts.

41

The prosecutor then asked Soares to assume facts similar to those shown by the evidence surrounding the November 5 and November 25 shootings. Based on these hypothetical facts, Soares opined that both shootings would have benefitted the Taliban.

The prosecutor's questions and the expert's testimony were largely indistinguishable from the approach endorsed by the Supreme Court in *Vang, supra*. We are bound to apply our high court's holding here. (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450 (*Auto Equity*).) Furthermore, the prosecutor's hypothetical facts were sufficiently supported by the evidence. Accordingly, we conclude Soares did not testify impermissibly on defendant's intent and guilt, and the court did not err by admitting the expert's opinions on that basis.

6. *Admission of Testimonial Hearsay Violated Crawford*

Defendant contends the trial court erred by admitting testimonial hearsay through the gang expert in violation of *Crawford*, *supra*, 541 U.S. 36. We agree, but we conclude admission of the testimonial statements was harmless.

a. *Legal Principles*

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) The Confrontation Clause thereby bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford*, *supra*, 541 U.S. at pp. 53-54.) This bar applies only to *testimonial* statements; admission of nontestimonial statements, while subject to state law hearsay rules, does not violate the Confrontation Clause. (*Id.* at p. 53.)

Generally, statements made by witnesses to police "are testimonial when the circumstances objectively indicate that there is no [ ] ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington* (2006) 547 U.S. 813, 822,

fn. omitted (*Davis*).) We review de novo whether a statement is testimonial and therefore implicates the Confrontation Clause. (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466.) "We evaluate the primary purpose for which the statement was given and taken under an objective standard, 'considering all the circumstances that might reasonably bear on the intent of the participants in the conversation.' " (*Ibid.* [citing *People v. Cage* (2007) 40 Cal.4th 965, 984].)

State law rules of evidence may allow for the admission of nontestimonial hearsay that forms the basis for an expert's opinions. "A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based . . . ." (Evid. Code, § 802.) "Of course, any material that forms the basis of an expert's opinion testimony must be reliable. [. . .] So long as this threshold requirement of reliability is satisfied, even matter that is ordinarily *inadmissible* can form the proper basis for an expert's opinion testimony. [Citations.] And because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion." (*Gardeley*, *supra*, 14 Cal.4th at p. 618, original italics.)

###### b.  *Procedural Background*

Defendant moved in limine to exclude Soares' testimony recounting information he obtained from police reports and gang-related hearsay statements made by other nontestifying witnesses. After a hearing under Evidence Code section 402, the trial court issued a written order granting the motion in part and denying it in part. The court identified five categories of statements at issue: Soares' conversations with gang members; his conversations with fellow police officers; his own investigations of gang-related crimes; police reports authored by him; and police reports authored by others.

43

The court ruled that the first two categories—Soares' conversations with gang members and with other police officers—were nontestimonial because they were not "akin to affidavits." As to Soares' own investigations and police reports, the court ruled that his statements were admissible as those of a percipient testifying witness to the extent he had personally observed the matters at issue. Finally, as to police reports authored by other officers, the court ruled that such statements were analogous to affidavits under *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, and therefore were testimonial. Accordingly, the court excluded testimony recounting statements set forth in police reports authored by others, but allowed Soares to testify as to the remaining categories of statements.

After closing arguments, the trial court instructed the jury: "In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider that particular expert's knowledge, skill, experience, training, education, and the reasons the expert gave for any opinion and the facts or the information on which the expert relied in reaching that opinion. *You must decide whether information on which the expert relied was true and accurate*. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence." (Italics added.) As to statements from "police reports and in other reference material" which Soares considered, the court instructed the jury: "You may consider them only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statement is true."

c. *The Confrontation Clause as Applied to Expert Basis Testimony*

The Attorney General, relying on *People v. Hill* (2011) 191 Cal.App.4th 1104, 1128-1137, argues that the court properly admitted hearsay statements— including *testimonial* statements—as the basis for Soares' expert opinions. The Attorney General contends the Confrontation Clause does not bar such statements because they were not

admitted for the truth of the matters asserted in them.[8] (See also *People v. Thomas* (2005) 130 Cal.App.4th 1202 (*Thomas*) [Confrontation Clause does not apply to expert basis testimony because it is not offered for the truth]; *People v. Cooper* (2007) 148 Cal.App.4th 731; *People v. Ramirez* (2007) 153 Cal.App.4th 1422; *People v. Sisneros* (2009) 174 Cal.App.4th 142.)

We respectfully disagree with *Hill* and *Thomas* regarding the admissibility of testimonial statements as the basis for an expert's opinion. *Hill* relied on *Gardeley*, *supra*, 14 Cal.4th 605, for the proposition "that the jury ' "may not consider those [hearsay] statements for the truth of the matter," ' but only to evaluate the expert opinion [citation]." (*Hill*, *supra*, 191 Cal.App.4th at p. 1128 [quoting *Gardeley*, *supra*, 14 Cal.4th at p. 612].) But that quote from *Gardeley* was taken from a portion of the *Gardeley* opinion summarizing the trial court's ruling and jury instruction in that matter. The Supreme Court in *Gardeley* never adopted the position that out-of-court statements offered as basis testimony are not admitted for their truth. To the contrary, our high court explicitly categorized such statements as hearsay and analyzed them accordingly. (*Gardeley*, *supra*, at pp. 618-619.) By definition, hearsay is "offered to prove the truth of the matter stated." (Evid. Code, § 1200.)

*Gardeley* simply recognized that Evidence Code section 802 incorporates an implicit state law hearsay exception for basis testimony. The high court held that such hearsay statements are admissible "because a witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact." (*Gardeley*, *supra*, 14 Cal.4th at p. 619.) This does *not* mean a jury may not evaluate the truth of basis testimony. As *Gardeley* recognized,

---

[8] This issue is currently pending before the California Supreme Court. (*People v. Sanchez*, review granted May 14, 2014, S216681; *People v. Archuleta*, review granted June 11, 2014, S218640 [briefing deferred pending consideration and disposition of *Sanchez*].)

" 'the law does not accord to the expert's opinion the same degree of credence or integrity as it does the data underlying the opinion. Like a house built on sand, the expert's opinion is no better than the facts on which it is based.' " (*Id.* at p. 618, quoting *Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 923 [holding that a party may impeach an expert witness by showing the falsity of any matter upon which the expert based his or her opinion].)

It is self-evident that an opinion based on false information is unreliable. "[W]here the facts underlying the expert's opinion are proved to be false or nonexistent, not only is the expert's opinion destroyed but the falsity permeates his entire testimony; it tends to prove his untruthfulness as a witness." (*Kennemur v. State of California*, *supra*, 133 Cal.App.3d at pp. 923-924.) If a jury cannot consider the truth of a statement offered as the basis for an opinion, the jury cannot accurately evaluate the reliability of the opinion or the credibility of the expert. Consistent with this principle, the jury here was explicitly instructed to decide whether the basis for the expert's opinion was true and accurate.

A majority of United States Supreme Court justices have recognized the "commonsense conclusion" that the basis for an expert's opinion must be considered for its truth. (*Williams v. Illinois* (2012) 132 S.Ct. 2221, 2257 [conc. opn. of Thomas, J.]; *id.* at pp. 2268-2272 [dis. opn. of Kagan, J., joined by Scalia, Ginsburg, and Sotomayor, JJ.] [to determine the validity of the expert's opinion, the factfinder must assess the truth of the out-of-court statement on which it relies].) "There is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth. 'To use the inadmissible information in evaluating the expert's testimony, the jury must make a preliminary judgment about whether this information is true.' " (*Id.* at p. 2257 [quoting D. Kaye, D. Bernstein, & J. Mnookin, The New Wigmore: A Treatise on Evidence: Expert Evidence § 4.10.1, p. 196 (2d ed. 2011)].) A majority of the justices of the California Supreme

Court has also expressed the view that basis testimony is offered for its truth and subject to Confrontation Clause analysis. (*People v. Dungo* (2012) 55 Cal.4th 608, 627 [conc. opn. of Werdergar, J.; *id.* at p. 635 [dis. opn. of Corrigan, J.].)

Furthermore, *Gardeley*'s holding on the admissibility of basis testimony is solely a state law hearsay rule. Testimony that may be allowed under state law may still be inadmissible under the Confrontation Clause. The court in *Gardeley*, a pre-*Crawford* case, had no occasion to consider the application of the Confrontation Clause to testimonial basis evidence. "It is axiomatic that cases are not authority for propositions not considered." (*People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10.) Thus, with respect to defendant's Confrontation Clause claims, we conclude we are not bound by *Gardeley* under *Auto Equity, supra*. Instead, we must look to post-*Crawford* jurisprudence for this analysis. In *People v. Valadez* (2013) 220 Cal.App.4th 16, 32, the Second District Court of Appeal opined that both the California and United States Supreme Court would likely reject the contention that expert basis testimony is not offered for the truth for Confrontation Clause purposes. We agree with this analysis. Accordingly, we will consider whether Soares gave testimonial statements made inadmissible under the standards set forth in *Crawford* and its progeny.

d. *Testimonial Statements Relied Upon by Soares*

Defendant contends Soares impermissibly testified to conversations he held with numerous nontestifying witnesses—including several gang members—as well as information he had received from other police officers in the course of his training. As to information Soares received as part of his training or in related conversations with other police officers, the record is clear that Soares relied upon such statements in forming his opinions. However, defendant does not identify any specific hearsay statements admitted into evidence that were made by other officers or as part of Soares' training. Our review of the record shows Soares gave general, nonspecific descriptions of the kinds of

information he received from these sources. But Soares' gave comparatively more specific testimony relaying conversations he had with Taliban gang members.

Defendant identifies several hearsay statements from Taliban gang members he contends were testimonial. First, Soares testified that Richard Burns had admitted he was a founding member of the Taliban, but the record contains no information about the circumstances under which that statement was made.

Second, Soares testified about statements Wilbert Ard made after Soares conducted a traffic stop on Ard. Soares testified that Ard threatened him with physical harm and yelled profanities at him. We conclude Ard's statements were not offered for their truth, but to show Ard's hostile state of mind, as the prosecutor highlighted in closing argument. Thus, even if these statements were testimonial, their admission did not violate the Confrontation Clause because they were not admitted for their truth. (*Crawford*, *supra*, 541 U.S. at p. 60, fn. 9 [citing *Tennessee v. Street* (1985) 471 U.S. 409, 414].)

Third, Soares testified about statements Richard Burns and Gary Farmer made to him after Soares took them into custody after a shooting in East Palo Alto. Soares testified he was working undercover in the area when he heard numerous gunshots and saw two vehicles drive by at high speed. Soares saw Burns driving one of the vehicles while Farmer leaned out of the window and shot at the other car. Soares gave chase in his vehicle, stopped Burns and Farmer, and arrested them. Farmer was found in possession of a large bag of cocaine base. During an in-custody interview, both Burns and Farmer admitted to being involved in the shooting. They admitted the shooting was gang related, and they stated they were shooting at rival gang members in retribution for another shooting earlier that day. Soares testified that Burns had since pleaded guilty to the offense.

It is well established that statements made by witnesses during a custodial police interview—i.e., statements "knowingly given in response to structured police

48

questioning"—are testimonial. (*Crawford*, *supra*, 541 U.S. at p. 53, fn. 4.) "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (*Id.* at p. 68.) Guilty pleas and plea allocutions are also testimonial. (*Id.* at p. 64; *Hill*, *supra*, 191 Cal.App.4th at p. 1136 [citing *United States v. McClain* (2d Cir. 2004) 377 F.3d 219, 221-222].) We hold the statements made by Burns and Farmer during the in-custody police interview were testimonial. Furthermore, because defendant had no opportunity to cross-examine Burns or Farmer, we hold the admission of these testimonial statements violated the Confrontation Clause.

Fourth, Soares testified to a recorded statement made by Daniel Coleman, an alleged gang member, after Soares had taken him into custody for possession of a firearm. Coleman was sitting in the back of a marked patrol car with another suspect when Soares placed a digital recorder in the back of the car to record their conversation. Coleman then told the other suspect that he (Coleman) had been holding the firearm for the purpose of protecting the gang. Although Coleman's statement was made while he was in custody, the record contains no facts showing it was "knowingly given in response to structured police questioning". (*Crawford*, *supra*, 541 U.S. at p. 53, fn. 4.) To the contrary, it appears the statement was recorded surreptitiously and was made without prompting from the police officer. Defendant presents no authority for the proposition that a statement made by one suspect to another, in the absence of any police questioning, constitutes a testimonial statement for Confrontation Clause purposes. We conclude this statement was not testimonial.

Finally, Soares testified about the March 2005 shooting of defendant and Tramel. Although Soares admitted he was not the investigator in that case, he testified that he relied in part on the victims' lack of cooperation in forming his opinion that they were gang members. The prosecutor subsequently presented Soares with an excerpt from a police report stating that the victims were uncooperative, and Soares testified that his

49

knowledge about their lack of cooperation came from that police report. Defendant contends the admission of this evidence violated *Crawford*.

We agree that police reports summarizing the historical facts of an offense are typically testimonial in nature. (See *Bullcoming v. New Mexico* (2011) 131 S.Ct. 2705, 2714-2715; *United States v. Johnson* (8th Cir. 2013) 710 F.3d 784, 789.) The usual purpose of a police report is to assist in the prosecution of a crime, and a police report is written with a high degree of formality and solemnity. "A police report is a quintessential example of an extrajudicial statement contained in a formalized testimonial material. It is signed by the attesting officer under penalty of law. It is prepared 'with an eye toward prosecution'; [citation]; and it is inherently accusatory." (*State v. Lahai* (2011) 128 Conn.App. 448, 469.) However, in this instance, the original declarant of the hearsay statement at issue was Detective Sergio Lopez of the San Mateo Sherriff's Office. Lopez took the stand in defendant's trial and testified about the March 2005 shooting based on his personal knowledge and his interactions with the victims. Because Lopez was available for cross-examination by defendant, the subsequent admission of his hearsay statement in the police report did not violate *Crawford*.

In summary, we conclude that most of the statements defendant challenges were either nontestimonial or did not violate his Confrontation Clause rights by their admission. However, we hold the expert's testimony recounting hearsay statements made by Burns and Farmer during an in-custody police interview were testimonial, and we hold their admission violated defendant's Confrontation Clause rights under *Crawford*.

### e. *Harmless Error Analysis*

The erroneous admission of testimonial statements requires an evaluation of whether the error prejudiced defendant under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684.) Under *Chapman*, the prosecution has the burden "to prove beyond a reasonable doubt that the error

complained of did not contribute to the verdict obtained." (*Chapman*, *supra*, 386 U.S. at p. 24.) "Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. [Citations.]" (*Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 684.)

The Attorney General points to the fact that the jury deadlocked on all gang allegations. We find the jury's deadlock on the gang allegations persuasive evidence to show they did not rely on inadmissible testimony by the gang expert. If the jury had returned true findings on one or all of the gang allegations, our analysis would be different. Furthermore, the jury did not convict defendant on the substantive charges relating to the November 5 shooting. This shows the jury was not biased against defendant by the allegations of his gang involvement and suggests the jury appropriately weighed the evidence relevant to each separate offense, as required.

In any event, the erroneously admitted testimonial statements were a small portion of the gang expert's testimony. Soares' testimony, adduced over three days, comprised nearly 300 pages of the reporter's transcript. His recounting of the inadmissible hearsay statements comprised less than seven full lines of testimony. Most of Soares' testimony concerning Burns and Farmer was based on his personal knowledge and observations— most significantly, as an eyewitness to Burns driving a vehicle at high speed while Farmer leaned out of the window and shot at another vehicle. Soares also testified that Burns bore a "Taliban squad" tattoo, among others; that Burns was pictured in photographs with other Taliban members; that Burns and his house were featured in Taliban-made videos; that a search of Burns' residence revealed gang-related indicia; and that Burns was convicted of an offense with a gang enhancement. As to Farmer, Soares

51

conducted a search of his residence and found a large amount of Taliban-related gang indicia, including a binder with "Taliban" and "Midtown" written on it; a backpack with "Midtown" on it; materials memorializing the deaths of other Taliban gang members; camouflaged clothing; and a black hoodie with the logo "Revenge is promised."

Given the jury's failure to return a finding on the gang enhancements—in addition to overwhelming evidence showing Burns and Farmer were Taliban gang members—we conclude the erroneous admission of their testimonial statements was harmless error beyond a reasonable doubt.

D. *Exclusion of Testimony by Defendant's Expert Witness*

Defendant contends the trial court erroneously excluded testimony by his expert witness in violation of his constitutional rights under Article I of the California Constitution and the Fifth, Sixth and Fourteenth Amendments of the United States Constitution. In pretrial proceedings, defendant proffered the testimony of Dr. Deborah Davis to impeach the prosecution's gang expert on the basis that the gang expert's methods were unreliable and his opinions subjectively biased. The trial court excluded the testimony on the grounds it would "consume an inordinate amount of time" and was "inappropriate, very confusing and of no probative value."

We hold the trial court erred by excluding Dr. Davis' testimony. The prosecution called 48 witnesses in 16 days of trial spanning a period of nearly seven weeks.[9] By contrast, Dr. Davis was defendant's sole witness, and the testimony at issue would likely have taken less than a day. In the context of this lengthy trial, Dr. Davis' testimony would not have required an undue consumption of time. Moreover, the proffered testimony was highly probative and presented little danger of confusing the jury. We conclude the error was harmless, however, given the jury's failure to return findings on the gang allegations.

_____

[9] The court ordered a midtrial continuance due to illness.

1. *Procedural Background*

The trial court held a pretrial hearing under Evidence Code section 402 to receive Dr. Davis's proffered testimony.[10]  Dr. Davis testified that she was professionally trained in the scientific method, its uses, and its misuses—that is, the proper methods by which evidence should be collected and used to objectively prove or disprove a given hypothesis.  She testified that the logic of the scientific method could be applied to the determinations of gang experts—specifically, an expert's classification of a person as a gang member based on certain characteristics.  She described that type of determination as one example of the more general scientific problem of classification—that is, whether evidence X justifies classification Y.  She presented a set of PowerPoint slides titled "Scientific Basis of Classification Criteria: Gangs" to illustrate how the scientific principles underlying the problem of classification could be applied to a gang expert's determination that a person is a gang member.

Among other topics, Dr. Davis testified to what is described in the scientific literature as the "base rate fallacy."[11]  She provided a numerical example to show that when a base rate—here, the percentage of gang members in the general population—is small, the use of a characteristic such as camouflage clothing to classify a person as a gang member could lead to a high rate of error.  She testified that an expert's rate of error could be high even if all gang members wore camouflage clothing while only a small percentage of the general population wore camouflage clothing.  She testified that it would be important to know the base rate of gang membership as well as the percentage of persons wearing camouflage clothing in the general population to make an accurate determination about a person's status as a gang member based on that characteristic.

---

[10] As noted above in Section I.A.5., Dr. Davis testified at trial as an expert on eyewitness identifications and interrogation techniques.

[11] See Bar-Hillel, Maya (1980), "The base-rate fallacy in probability judgments," *Acta Psychologica* 44: 211–233.

Dr. Davis also testified more generally about the unreliability of making determinations based on personal experience. She presented a set of PowerPoint slides illustrating the problems of using a subjective, experience-based approach as compared with the proper application of the scientific method using objectively defined criteria. She testified that experience-based methods are characterized by the lack of objective criteria, the use of objective criteria in an improper manner, or the use of objective criteria with improper weighting. She also testified that such subjective, experience-based determinations are vulnerable to a psychological phenomenon known as "confirmation bias" in the scientific literature.[12] Confirmation bias causes observers to give greater weight to information that confirms their existing opinions while ignoring information that disconfirms them. By the same token, observers may selectively search for information that confirms what they expect to be true. Dr. Davis gave several examples from the scientific literature in which subjective, experience-based judgments were demonstrated to be unreliable. She opined that determinations based on subjective experience are generally less accurate than those based on the proper use of statistical models and objective criteria. She further testified that the same reasoning applies to determinations made by a gang expert, e.g. an expert's subjective determination that a person is a gang member based on the expert's personal experiences.

The prosecution filed written objections to Dr. Davis' testimony, arguing the testimony regarding the importance of base rates was confusing and irrelevant because "it requires a scientific method be employed for a non-scientific opinion, such as gang membership." The prosecution also objected to Dr. Davis' testimony about the unreliability of experience-based opinions. It argued that the California Supreme Court has held gang expert testimony to be admissible, and that "gang expert testimony is not scientific and is therefore not subject to scientific scrutiny."

---

[12] See R. Nickerson (1998), "Confirmation Bias: A Ubiquitous Phenomenon in Many Guises," 2 *Rev. of Gen. Psych.*, 175, 177.

The trial court issued a written order excluding Dr. Davis' testimony on these subjects. The court based its ruling primarily on grounds governed by Section 352.[13] While the court found Dr. Davis qualified as an expert in the scientific method, it also found "there is no indication that in any realistic, real world situation a witness qualified as a gang expert would be required to use the scientific method" to make determinations. In addition, it found Dr. Davis' testimony would be "extremely confusing" to the jury "because it is very hard to understand why or how an expert in criminal street gangs would employ the scientific method as described by Dr. Davis to the in-field observations and investigations upon which Sergeant Soares relies or should rely." Finally, the court found that Dr. Davis' testimony had "no probative value" and would consume "an inordinate amount of time."

2. *The Trial Court Erroneously Excluded Dr. Davis' Expert Testimony*

The trial court erred by excluding expert testimony proffered to impeach the reliability of the prosecution's gang expert. First, the record does not support the trial court's conclusion that Dr. Davis' testimony would have consumed an inordinate amount of time. Dr. Davis was defendant's only witness at trial, and because she testified on other matters, her qualifications and experience were already in the record. The proffered testimony at issue—including the prosecution's cross-examination—was adduced in less than one afternoon at the pretrial hearing. It comprised 89 pages of the reporter's transcript. By contrast, the prosecution's case required 16 days of trial, during which 48 witnesses were called. The prosecution's expert alone gave testimony comprising nearly 300 pages of the reporter's transcript. In the context of this record, we find no support for the finding that Dr. Davis' testimony would have required an undue consumption of time.

---

[13] Evidence Code section 352 and the applicable standard of review are set forth above in Section II.C.2.

Second, we conclude Dr. Davis' proffered testimony was probative as impeachment of the prosecution's expert witness. The trial court misconstrued the import of her testimony in this regard. The court—echoed by the Attorney General in her brief on appeal—conflated the admissibility of Dr. Davis' testimony with the admissibility of Soares' testimony. Defendant did not proffer Dr. Davis to show Soares was legally *required* to use the scientific method in reaching his conclusions. As the Attorney General and the trial court both point out, and as we acknowledge in Section II.C.3., the admissibility of the type of gang expert testimony offered by Soares has long been upheld by the California Supreme Court. (*Gardeley*, *supra*, 14 Ca1.4th at p. 617.) But that is not the question presented. The question is whether, given the admission of Soares' testimony, defendant should have been allowed to present testimony on the reasons why Soares' conclusions could be unreliable. On this point, Dr. Davis' expert testimony was relevant.

Dr. Davis cited scientific literature to demonstrate that determinations based on subjective experience are comparatively less reliable than determinations made using rigorous methods and objective data. This principle directly impeached the determinations made by the prosecution's expert in this case. When cross-examined on the basis for his opinion that defendant was a Taliban gang member, Soares admitted he used "no objective standard" and that it was "subject to [his] interpretation." Soares also testified that his determinations were based on a "totality of circumstances" analysis. And while Soares identified many objective criteria informing his opinions as to whether a person is a gang member—e.g., the presence of tattoos, the throwing of gang signs, photos and videos on the Internet, MySpace websites, use of a gang moniker, the presence of gang graffiti, and certain types of clothing—defendant exhibited none of these objective criteria. For example, defendant had no gang-related tattoos, Soares had never seen defendant throwing gang signs, and he had never seen defendant in any gang-related photos or videos. When cross-examined about the absence of these criteria with

56

respect to defendant, Soares testified that their absence did not mean defendant was *not* a gang member.

It was therefore apparent that Soares did not use the objective criteria noted above in a systematic fashion to support his opinion that defendant was a member of the Taliban. Nor did Soares systematically use any of these criteria to support his opinion that Tramel was a member of the Taliban. Accordingly, Dr. Davis should have been allowed to opine that Soares' determinations, based purely on his subjective experience, were subject to confirmation bias and other logical errors identified in the scientific literature.

Dr. Davis' testimony concerning the base rates fallacy was also probative. Soares testified that around 2005, when the Taliban was in its infancy, the gang consisted of only five to ten members. Because the number of gang members was extremely small compared to the size of the general population in the area, the base rate of gang membership was necessarily low. Thus, the use of a characteristic that was not exclusive to gang members—e.g., the wearing of a certain type of clothing—could have produced unreliable conclusions about the classification of people as gang members based on that characteristic. These theories of impeachment were "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801.) And we find no support for the trial court's finding that the testimony would have confused the jury. While the topics addressed by Dr. Davis were not intuitive or obvious, that is why expert testimony was necessary "to assist the trier of fact." (*Ibid.*) Furthermore, Dr. Davis' testimony was sufficiently based on scientific literature "of a type that reasonably may be relied upon . . . ." (*Ibid.*) For these reasons, we hold defendant was entitled to present Dr. Davis' expert testimony to impeach the reliability of the prosecution's gang expert.

We also disagree with the trial court's conclusion that scientific methods and principles are inapplicable to "real world" determinations such as those presented by the

prosecution's gang expert. Testimony of the sort presented by the prosecution's gang expert constitutes "expert testimony in the area of gang sociology and psychology . . . ." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1370.) Sociologists and psychologists have developed scientific methods and approaches to the study of many such social phenomena, including street gangs. (See, generally, Maxson et al. (2013) *The Modern Gang Reader*.) This is not to say a gang expert's opinions must be supported with scientific rigor to be admissible at trial. Again, as we acknowledge above in Section II.C.3., California courts have long held the type of gang expert opinions presented by Soares to be admissible under Evidence Code section 801. But upon the admission of such testimony, a defendant must be allowed to impeach it with qualified expert opinions setting forth scientifically valid reasons to show why that testimony may be unreliable.

   3. *Harmless Error Analysis*

   Because admissibility of testimony under Section 352 is a generally a matter of state law, erroneous exclusion of the proffered testimony would require reversal only if it is reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611 [applying the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)].) Defendant contends the error violated his constitutional rights to confrontation under *Chambers v. Mississippi* (1973) 410 U.S. 284 [exclusion of confession made by third party and denial of right to cross-examine third party violated due process] and *Cudjo v. Ayers* (9th Cir. 2012) 698 F.3d 752 [federal constitutional error to exclude confession by third party witness who was "crucial to the defense's theory of the case"].) But Dr. Davis' testimony was not so crucial to defendant's case that its exclusion amounted to federal constitutional error. Furthermore, defendant effectively cross-examined Soares on many of the issues in question, particularly his subjective application of criteria to decide a person's gang membership. The United States Supreme Court has noted that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose

reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we [have] observed [. . . ], 'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (*Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 679 [quoting *Delaware v. Fensterer* (1985) 474 U.S. 15, 20].) For these reasons, we will apply the prejudice standard set forth in *Watson*.

The erroneously excluded testimony related most directly to the gang allegations. As noted above, the jury returned no findings as to any of the gang allegations, and the allegations were subsequently dismissed. It is not clear how defendant could have obtained "a result more favorable" had the testimony been admitted. Defendant cites no authority for the proposition that a defendant can suffer prejudice under these circumstances. Nonetheless, even assuming he could have obtained a more favorable result in some sense—e.g., a unanimous "not true" finding—such an outcome was not reasonably probable here. The excluded testimony was primarily targeted at Soares' opinions that certain persons were Taliban gang members. But the prosecution merely had to prove that the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang. (Pen. Code, § 186.22, subds. (b)(1)(C) & (b)(4).) The best evidence supporting this link was not Soares' expert opinion testimony, but the eyewitness testimony of the partygoers who heard and observed the shooters yelling gang slogans. And while the prosecution was required to prove the existence of the Taliban as a criminal street gang whose members engaged in a pattern of criminal activity, Soares presented overwhelming evidence to support such findings. To obtain a unanimous not true finding, defendant would have to convince all twelve jurors to disregard this evidence. Ten jurors voted to find the gang allegations true, so defendant needed to change ten minds to obtain a unanimous not true finding. We conclude it was not

reasonably probable that defendant could have done so. Our analysis would be different if the jury had returned a true finding on any of the gang enhancements; in that event, defendant would only have to change the mind of a single juror to obtain a more favorable outcome. But given the record here, it was not reasonably probable that the jury would have unanimously found the gang allegations not true.

As to the convictions on the substantive offenses, the proffered testimony was not directly relevant to the elements of those offenses. While evidence of gang activity always carries the potential for prejudice, it appears the jury here properly evaluated the non-gang-related evidence relevant to the substantive charges apart from the gang-related evidence. For example, the jury returned no verdict on Counts Three and Four pertaining to the November 5 shooting in Sunnyvale, reflecting the comparatively weaker evidence that defendant was involved in that shooting. Furthermore, defendant points to no evidence in the record showing that the jury's convictions on Counts One and Two were improperly influenced by prejudice stemming from allegations of his gang membership. "In analyzing the prejudicial effect of error . . . an appellate court does not *assume* an unreasonable jury. Such an assumption would make it virtually impossible to ever find error harmless. An appellate court necessarily operates on the assumption that the jury has acted reasonably, unless the record indicates otherwise." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1127.)

For these reasons, we conclude the erroneous exclusion of defendant's proffered expert testimony was harmless under *Watson*.

E. *The Denial of Defendant's Motion for Mistrial*

Defendant contends the trial court erroneously denied his motion for a mistrial in violation of his constitutional rights under Article I of the California Constitution and the Fifth, Sixth and Fourteenth Amendments of the United States Constitution. Over defendant's objection, the court allowed Shaina Hamilton to testify that Tramel's cousin had threatened her. Defendant subsequently moved for a mistrial, and the court denied

60

the motion. We conclude the trial did not abuse its discretion in allowing the testimony and denying the motion for a mistrial.

### 1. *Procedural Background*

Shaina Hamilton drove with Lavell and others to the November 25 party, but she testified that she did not see the shootings. She testified that she heard the gunshots from behind her as she was leaving the party. She also testified that she saw defendant put a silver gun into the glove compartment of Janet's car after the group drove to downtown San José. She testified reluctantly under subpoena and stated, "If I could avoid it, I wouldn't be here." She admitted that when the police questioned her she did not tell them Lavelle was in the car she had driven to the party. She could not explain why she did not tell police about Lavell's presence.

Shaina testified that she "had problems" with Tramel's cousin after the shooting and that "[Tramel's cousin] would come to me and tell me that snitches get stitches." Shaina testified that Janet was present when the threats were made. When the prosecution asked Shaina how the threats made her feel, she responded: "I don't know really. I really didn't have any feelings, maybe wanted to stay away from her, maybe." She testified that she understood the phrase "snitches get stitches" to mean that "if you tell on someone they're going to do something to you or they're going to beat you up maybe."

Defendant objected to the testimony on the grounds that it was highly prejudicial and lacking in probative value under Section 352. Defendant also invoked his due process rights under the Fifth and Fourteenth Amendments, and his rights to a fair trial and confrontation under the Sixth Amendment. The prosecution argued the testimony should be allowed because it explained the witness's reluctance to testify and her prior lack of candor with police.

The trial court admitted the testimony on the grounds put forth by the prosecution. The court instructed the jury: "[T]hat testimony is relevant only on the question of why

61

this witness at any time was reluctant to testify.  It is not evidence that Mr. Edwards is connected in any way with the making of the statement and should not be used by you for that purpose."

The next day, defendant filed a written motion for mistrial based on the admission of Shaina's testimony.  Defendant argued that admission of the testimony was error because the prosecution had presented no evidence showing defendant had authorized the threats.  The trial court denied the motion in a written order.

2. *Legal Principles*

When used to show a defendant's consciousness of guilt, evidence of a third party's attempt to intimidate a witness is inadmissible unless there is reason to believe the defendant was involved in the intimidation.  (*People v. Abel* (2012) 53 Cal.4th 891, 924 (*Abel*).)  But "[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible.  [Citations.]  An explanation of the basis for the witness's fear is likewise relevant to her [or his] credibility and is well within the discretion of the trial court."  (*People v. Burgener* (2003) 29 Cal.4th 833, 869.)  "Moreover, evidence of a 'third party' threat may bear on the credibility of the witness, whether or not the threat is directly linked to the defendant."  (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1084.)

3. *Admission of the Testimony and Denial of the Motion for Mistrial Was Not an Abuse of Discretion*

Defendant contends the trial court erred by admitting the testimony and denying his motion for mistrial because the prosecution presented no evidence showing he authorized or knew about the threats.  For this proposition, defendant relies on *People v. Weiss* (1958) 50 Cal.2d 535, 554; *People v. Warren* (1988) 45 Cal.3d 471, 481; and *People v.Terry* (1962) 57 Cal.2d 538, 565-566.  The Attorney General argues that the threats were relevant to Shaina's credibility under *People v. Abel*, *supra*, 53 Cal.4th at page 924.  Defendant acknowledges that evidence of third-party threats against a witness

may be relevant to the witness's state of mind, but he contends that principle does not apply here because Shaina testified that the threats did not affect her.

We agree with the Attorney General that the testimony was relevant to Shaina's credibility.  It is true that Shaina testified she "didn't have any feelings" in response to the threats, but she also testified that she wished to stay away from Tramel's cousin, and she could not explain why she had not been forthright when the police questioned her.  A reasonable jury could have inferred that the threats had affected her testimony.  The testimony was therefore relevant and probative to her credibility under *People v. Abel*, *supra*, 53 Cal.4th at page 924.  Furthermore, the trial court appropriately instructed the jury not to consider the testimony as evidence that defendant was in any way connected to the threats.  Absent a showing to the contrary, " 'we must assume that juries for the most part understand and faithfully follow instructions.  The concept of a fair trial encompasses a decision by a tribunal that has understood and applied the law to all material issues in the case.' " (*Francis v. Franklin* (1985) 471 U.S. 307, 324 [quoting R. Traynor, The Riddle of Harmless Error (1970) at pp. 73-74].)  We conclude the trial court did not abuse its discretion in admitting the challenged testimony and denying defendant's motion for mistrial.

F.  *Instructions on Accomplice Liability*

Defendant contends the trial court erred by instructing the jury on accomplice liability in violation of his constitutional rights under Article I of the California Constitution and the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.  As to liability for aiding and abetting, the court instructed the jury that an aider or abettor is "equally guilty" as the perpetrator.  The Attorney General contends the instruction was correct and that defendant forfeited this claim by failing to object.  Defendant contends the instruction was misleading and should have been modified because an aider and abettor may be less guilty than the perpetrator if the aider and abettor has a less culpable mental state.  (See *People v. McCoy* (2001) 25 Cal.4th 1111

63

(*McCoy*); *People v. Loza* (2012) 207 Cal.App.4th 332 (*Loza*); *People v. Nero* (2010) 181 Cal.App.4th 504 (*Nero*); *People v. Samaniego* (2009) 172 Cal.App.4th 1148 (*Samaniego*).)  Defendant alternately frames his claim as ineffective assistance of counsel for failure to object.

### 1. *Procedural Background*

The trial court instructed the jury on accomplice liability in accord with CALCRIM Nos. 400, 401, and 403, revised as of 2009.  As relevant here, the court instructed the jury pursuant to former CALCRIM No. 400, as follows:  "A person is equally guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator who committed it."[14]  Defendant lodged no objection to this language, and he requested no modification.[15]  The court then instructed the jury that the prosecution was required to prove "the accused knew that the perpetrator intended to commit the crime" and that "the accused intended to aid and abet the perpetrator in committing the crime . . . ."  The court further instructed the jury on the doctrine of natural and probable consequences, with murder as the nontarget offense and shooting at an inhabited dwelling, among others, as the target offense:  "The accused may also be guilty of murder as charged in Count One if he intended to aid and abet a crime other than murder.  To prove the accused is guilty of murder under such circumstances, the People must prove, one, the accused is guilty of . . . shooting at an inhabited dwelling and during the . . . shooting at an inhabited dwelling, a co-participant in . . . shooting at an inhabited dwelling, committed the crime of murder . . . and . . . under all of the circumstances, a reasonable person in the accused's position would have known that the commission of

_____

[14] CALCRIM No. 400 (2015 rev.) has since been revised to state:  "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."

[15] Defendant had previously lodged an objection to the instruction on separate grounds not relevant here.

murder . . . was a natural and probable consequence of . . . shooting at an inhabited dwelling . . . ."[16]

### 2. *Defendant Suffered No Ineffective Assistance of Counsel*

We agree with the Attorney General that defendant forfeited his claim of instructional error by failing to object or request a modification below. (*Loza*, *supra*, 207 Cal.App.4th at p. 350 [defendant forfeited claim by failing to request a modification].) We will therefore consider defendant's claim as one of ineffective assistance of counsel. To demonstrate ineffective assistance of counsel, defendant must first show counsel's performance was deficient because counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) Second, he must show prejudice flowing from counsel's performance or lack thereof. (*Id.* at pp. 691-692.)

"Generally, a person who is found to have aided another person to commit a crime is 'equally guilty' of that crime." (*People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118 [disapproved on other grounds by *People v. Banks* (2015) 61 Cal.4th 788].) However, in *McCoy*, *supra*, 25 Cal.4th at page 1122, the California Supreme Court held that an aider and abettor may be guilty of a greater homicide-related offense than the actual perpetrator of the offense if the aider and abettor's mens rea is more culpable than the perpetrator's mens rea. Several courts of appeal have extended this logic to conclude that an aider and abettor may be *less* guilty than the perpetrator if the aider and abettor has a less culpable mens rea. (*Loza*, *supra*, 207 Cal.App.4th 332; *Nero*, *supra*, 181 Cal.App.4th 504; *Samaniego*, *supra*, 172 Cal.App.4th 1148.)

*McCoy* repeatedly emphasized that "an aider and abettor's mens rea is personal, that it may be different than the direct perpetrator's: 'guilt is based on a combination of

---

[16] The numerous ellipses in this quote partly reflect omission of the two other target offenses included in the instruction. A description of the other target offenses is not necessary to our analysis.

the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state' [citation]; an aider and abettor's 'mental state is her [or his] own; she [or he] is liable for her [or his] mens rea, not the other person's' [citation]; aider and abettor liability is 'premised on the combined acts of all the principals, but on the aider and abettor's own mens rea' [citation]." (*Nero*, *supra*, 181 Cal.App.4th at p. 514, original italics.)  These courts have concluded that the "equally guilty" language of CALCRIM No. 400 may be misleading in certain circumstances.  "Because an aider and abettor's mental state 'floats free' from that of the direct perpetrator's, at least two courts have concluded that in certain circumstances, the 'equally guilty' language found in CALCRIM No. 400 . . . can be misleading by suggesting to the jury that it may not find an aider and abettor to be guilty of a lesser offense from that of the direct perpetrator." (*Loza*, *supra*, 207 Cal.App.4th at pp. 351-352.)  But these courts developed this logic outside the context of the natural and probable consequences doctrine. (*McCoy*, *supra*, 25 Cal.4th at p. 1117 ["Nothing we say in this opinion necessarily applies to an aider and abettor's guilt of an unintended crime under the natural and probable consequences doctrine"]; *Nero*, *supra*, 181 Cal.App.4th at p. 514; *Samaniego*, *supra*, 172 Cal.App.4th at p. 1166.)

As the Court of Appeal observed in *People v. Canizalez* (2011) 197 Cal.App.4th 832, the mens rea of the aider and abettor with respect to the nontarget offense is irrelevant under an aider and abettor theory of liability for natural and probable consequences; the nontarget offense need only be a reasonably foreseeable consequence of the intended target offense.  "By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all.  It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense.  [Citation.] Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a

66

reasonable person could have foreseen the commission of the nontarget crime. It follows that the aider and abettor will always be 'equally guilty' with the direct perpetrator of an unintended crime that is the natural and probable consequence of the intended crime. Consequently, the statement in CALCRIM No. 400 . . . is a correct statement of the law when applied to natural and probable consequence aider and abettor culpability and was properly given in this case." (*Id.* at p. 852.)

We agree with *Canilazez* that the instruction given here was not a misleading statement of the law under the natural and probable consequences theory of liability. Furthermore, the jury here was properly instructed as to the required mens rea—that defendant knew that the perpetrator intended to commit the target offense (shooting at an inhabited dwelling) and that he intended to aid and abet the perpetrator in committing that target offense. "This instruction advised the jury that it must base its decision of each appellant's liability not simply on the mental state of the direct perpetrator of the crime, but on that appellant's state of mind and the extent to which he knew of and intended to facilitate the purpose contemplated by the perpetrator." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 625.) Thus, we conclude defense counsel did not provide deficient performance by failing to object or request a modification. Moreover, there was no indication that the jury misapplied CALCRIM No. 400—e.g., by finding defendant guilty based solely on another perpetrator's guilt and without finding defendant possessed the requisite mens rea.

G. *Instruction on Transferred Intent*

Defendant contends the trial court erroneously instructed the jury on transferred intent in violation of his constitutional rights under Article I of the California Constitution and the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution. Defendant argues that a transferred intent instruction was unsupported because the prosecution failed to prove that he or any other perpetrator harbored any intent to kill. He further contends the trial court erred by giving a modified version of

67

CALCRIM No. 562 that conflated his intent with that of other perpetrators. We find these arguments without merit.

### 1. *Procedural Background*

The trial court instructed the jury on transferred intent with a modified version of CALCRIM No. 562: "If the accused or actual perpetrator intended to kill one person but by mistake or accident killed someone else instead, then the crime, if any, is the same as if the intended person had been killed."[17] Trial counsel objected on the ground that the evidence was insufficient to show that any of the shooters intended to shoot someone who was not shot. Counsel argued that the instruction could be used improperly to convict defendant of first degree murder even if he was only guilty of second degree murder. The trial court overruled defendant's objection.

### 2. *The Trial Court Did Not Err By Instructing the Jury on Transferred Intent*

"The common law doctrine of transferred intent is recognized and followed in California." (*People v. Mathews* (1979) 91 Cal.App.3d 1018, 1024.) " 'It has been long accepted that if A shoots at B, intending to kill B, but instead the bullet strikes C, then A has committed a criminal act as to C. In such instance, the "malice follows the blow" and the criminal intent of A to harm B is transferred to C.' " (*Id.* at p. 1023 [quoting *State v. Clifton* (1972) 32 Ohio App.2d 284].) However, "just as 'one's criminal intent follows the corresponding criminal act to its unintended consequences,' so too one's *lack* of criminal intent follows the corresponding *non*-criminal act to its unintended consequences." (*People v. Levitt* (1984) 156 Cal.App.3d 500, 507 [superseded by statute on another ground].)

Defendant contends the evidence was insufficient to support an instruction on transferred intent. He argues that intent to kill could not have been transferred to

---

[17] The unmodified version of CALCRIM No. 562 does not include the words "or actual perpetrator."

defendant because the prosecution failed to establish that he or any other perpetrator harbored an intent to kill. We disagree.

The shootings on November 25 occurred shortly after an altercation between some members of the group from East Palo Alto and some of the other partygoers. When the shooters fired their weapons, at least one of the partygoers involved in the altercation—Jesús "Chuy" Cazares-Soriano—was still outside in front of the house. A reasonable jury could have found that one or more of the shooters intended to kill Chuy, and that the actual victim, Michael DeJesús, was an unintended target. As for counsel's concern that the jury could improperly convict defendant of first degree murder, the jury acquitted defendant on that charge.

Defendant further contends the court erred by adding the words "or actual perpetrator" to the language of CALCRIM No. 562. He argues that the modified language "erroneously conflated appellant's intent with the intent of other alleged perpetrators" by making him liable for the perpetrator's mens rea rather than his own. But under the natural and probable consequences doctrine, defendant was properly liable for a killing by another perpetrator even if defendant lacked the intent to kill, provided the killing was a reasonably foreseeable consequence of a crime (the target offense) he intended to aid and abet. The jury was so instructed, and as set forth above in Section II.A.3, there was abundant evidence to support defendant's liability under this theory. Even assuming the instruction was erroneous, it presented no possibility of prejudice to defendant. We conclude this claim is without merit.

H. *The Trial Court's Refusal to Declare a Mistrial*

Defendant contends the trial court erred by failing to declare a mistrial after the jury indicated it was deadlocked. Defendant further argues this error was reinforced by the trial court's repetition of former CALCRIM No. 400, discussed above in Section II.F., because repetition of the instruction "directed jurors in the minority to compromise." We

69

conclude the trial court did not abuse its discretion by instructing the jury to continue deliberations.

1. *Procedural Background*

The original jury began deliberating on the morning of April 7, 2010. On the fourth day of deliberations, the foreperson notified the court that he had suffered a family emergency. The court seated an alternate juror in his place and instructed the jury to begin deliberations anew. Later that day, the reconstituted jury asked, "If we don't come to an agreement on any verdict, what would our next step be?" The court, noting that the reconstituted jury had only been deliberating for three hours, found the question was "premature" and instructed the jury to continue deliberations.

The next day, the jury requested "[c]larification of the law regarding: 1) aiding and abetting[;] 2) conspiracy[;] and examples of application of the law." With the stipulation of both parties, the court instructed the jury to review the instructions on aiding and abetting, natural and probable consequences, and conspiracy.

After four days of deliberation by the reconstituted jury, the foreperson notified the court, "We are unable to reach an agreement on any charge after lengthy deliberations and strongly believe that this outcome will not change." In response, the court requested a tally of votes. The foreperson notified the court that the jury was split 10 to two on Counts One and Two, seven to five on Count Three, and six to six on Count Four.

The next morning, the court asked the foreperson, "[I]n your estimation, is there any item of testimony, any further jury instruction, or any other definitions that would be of assistance to you in reaching any kind of verdict in this matter?" The foreperson responded, "I think the main thing that we've gone back and forth on and tried to work through that we may have asked for previously but maybe not specifically was a more comprehensive explanation and possibly examples of liability theory under aiding and abetting." In response to further query, the foreperson added: "You know, we have a lot of evidence in there. We've gone through it multiple times. I think we've—you know,

70

we feel like we've beaten every issue to death. And really from almost day one, even before the make-up of the jury changed, our—the results of our conversation and information sharing and, you know, dynamic among the group has not changed. [¶] And so we're feeling like it's not going to change in some respects no matter what we see or what we talk about."

The trial court instructed the jury to return to the jury room to "think about what else the Court could provide," adding, "I want to give you any opportunity and assistance to sort either the facts or the law out because you're the judges." The court then instructed the jury based on *People v. Butler* (2009) 46 Cal.4th 847, 883, fn. 19 (*Butler*), as follows: "Although the verdict or verdicts to which a juror agrees must, of course, be his or her own verdict, the result of his or her own convictions and not mere acquiescence in a conclusion of his or her fellows; yet in order to bring 12 minds to a unanimous result you must examine the question or questions submitted to you with candor and with proper regard and deference to the opinions of each other. Remember that you're not partisans or advocates in this matter. You're impartial judges of the facts. Each of you must consider the evidence for the purpose of reaching the verdicts if you can do so. Each of you must decide the case for yourself but should do so only after discussing the evidence and instructions with the other jurors. And with this view, it is your duty to decide the case if you can conscientiously do so. In conferring together, you ought to pay proper respect to each other's opinions and listen with a disposition to be convinced to each other's arguments." The court stated it would confer with counsel regarding further instruction on aiding and abetting. The court asked the jury "to retire and see if there's anything else in a constructive manner you can come up with which we'd be glad to help you with." The jury continued to deliberate.

Defendant objected to further reading of instructions on the basis that "there is a tendency for jurors, especially jurors in a minority, to feel pressured." Defendant specifically objected under the Fifth, Sixth, and Fourteenth Amendments to further

instructions on aiding and abetting on the ground that it would "give[] the impression that the Court or that the system is looking for them to come to a decision." Soon thereafter, the jury submitted another question requesting "clarification on the definition" of the phrases "specifically intends" and "intended to aid and abet" as used in the instruction on aiding and abetting.[18] In response, the court reread several instructions to the jury, including those on aiding and abetting and the doctrine of natural and probable consequences. These instructions included the "equally guilty" language of former CACLRIM No. 400, considered above in Section II.F.

After another day and a half of deliberations, the court excused another juror on hardship grounds. The court replaced her with an alternate juror and instructed the second reconstituted jury to begin deliberations anew. After three more days of deliberation, the jury returned its verdicts.

2. *Legal Principles*

Penal Code section 1140 provides, in part: "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, . . . unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." (Pen. Code, § 1140.) "The determination whether there is reasonable probability of agreement rests in the sound discretion of the trial court." (*People v. Miller* (1990) 50 Cal.3d 954, 994.) "The decision whether to declare a hung jury or to order further deliberations rests in the trial court's sound discretion. [Citations.] 'Although the court must take care to exercise its power without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency [citation], the court may direct further deliberations upon its reasonable conclusion that such direction would be perceived " 'as a means of enabling the jurors to

_____

[18] The referenced instruction was based on CALCRIM No. 401.

72

enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered.' " ' " (*People v. Debose* (2014) 59 Cal.4th 177, 209 [quoting *People v. Proctor* (1992) 4 Cal.4th 499, 539].)  "Any claim that the jury was pressured into reaching a verdict depends on the particular circumstances of the case." (*People v. Pride* (1992) 3 Cal.4th 195, 265.)

> 3. *The Trial Court Did Not Abuse Its Discretion By Instructing the Reconstituted Jury to Continue Deliberating*

Defendant argues that the "jury had been deliberating for four days when it sent its first notice of deadlock and eight days when it sent its second notice of deadlock."  The record does not support this assertion.  First, the note defendant describes as "the first notice of deadlock" came from the reconstituted jury, which had just been instructed to begin deliberations anew.  The note asked what the next step would be "*[i]f* we don't come to an agreement on any verdict." (Italics added.)  The jurors did not state they were deadlocked, and they had only been deliberating for three hours at that point.

The reconstituted jury sent the second note after it had been deliberating for four days.  The jurors had been presented with a substantial volume of evidence, including the testimony of 49 witnesses and more than 200 exhibits.  The charges and enhancements were complex, and the jury was instructed to consider multiple theories of liability.  At that point, the trial court instructed the jury using the same instruction issued to a deadlocked jury in *People v. Butler*, *supra*, 46 Cal.4th 847.  In *Butler*, the California Supreme Court approved of the instruction, rejecting the defendant's claim that the instruction was unduly coercive. (*Id.* at pp. 883-884.)  We find no grounds to distinguish *Butler* from this case.

We conclude the record supports the trial court's finding of a reasonable probability the jury could reach a verdict.  Furthermore, the trial court's instructions were in no way coercive.  The court asked the jury to consider whether there were any further instructions that might assist the jury in reaching a verdict, and the court issued the

approved language of *Butler*. Within a short period of time, the jury returned with further questions regarding aiding and abetting liability, whereupon the court provided further instruction and the jury continued deliberations. The trial court did not abuse its discretion by requiring the jury to deliberate further.

Defendant also argues the court improperly directed the minority jurors to compromise by repeating the purportedly erroneous instruction based on CALCRIM No. 400. As we conclude above in Section II.F., the language of the instruction is not misleading where the jury is also instructed to consider the natural and probable consequences of aiding and abetting, and where the jury is properly instructed on the required mens rea. Furthermore, nothing in the language of the instruction can be construed as directing any particular faction of jurors to compromise.[19] Accordingly, we conclude this claim is without merit.

I.  *The Trial Court's Response to a Jury Question on Aiding and Abetting and Natural and Probable Consequences*

Defendant contends the trial court erred in its answer to a question from the jury regarding aiding and abetting and natural and probable consequences. Defendant argues the trial court's answer constituted a directed verdict, removed elements of the offenses from the jury's consideration, and relieved the prosecution of its burden to prove guilt beyond a reasonable doubt. We conclude the trial court's answer to the jury's question was not erroneous in the context of the jury instructions as a whole.

1.  *Procedural Background*

In its sixth day of deliberations, the reconstituted jury asked the following question: "If we agree that the accused is guilty of either shooting at an inhabited dwelling (Penal Code 246) or Gross Negligent Discharge of a Firearm (Penal Code

---

[19] Defendant's argument assumes there was a minority of jurors voting not guilty for reasons relevant to the instruction. But the record does not reveal how many jurors wished to vote not guilty at that point; nor does it reveal why any of those jurors wished to vote not guilty.

246.3) and we agree that murder (Penal Code 187) is a natural and probable result of one of those crimes, then must we find the defendant guilty of murder in violation of Penal Code section 187. One of our jurors would like clarification of this instruction." The phrase "403 on page 43" was written in parentheses below the word "instruction." Page 43 of the jury instructions gave the full instruction on natural and probable consequences based on CALCRIM No. 403. The prosecution proposed to answer the question "yes." Defendant filed written objections to the proposed answer on grounds largely identical to those now raised on appeal. The trial court agreed with the prosecution and answered the jury's question with a written response stating "YES."

2. *The Trial Court Did Not Err in Answering the Jury's Question*

Defendant argues the trial court's response violated his constitutional rights under Article I of the California Constitution and the Fifth, Sixth and Fourteenth Amendments of the United States Constitution. Defendant puts forth several grounds supporting his claim. First, he argues the response provided an incomplete description of the law regarding the natural and probable consequences of aiding and abetting. For example, he notes the answer did not instruct the jury that the defendant must know of the perpetrator's unlawful intent; that the defendant must intend to aid and abet the perpetrator in the commission of the target offense; and that murder must be a reasonably foreseeable consequence of the perpetrator's offense. He further contends that the jury's question failed to identify which offenses the jury considered to be the target offenses and which it considered to be nontarget offenses.

This argument fails to acknowledge that the question was not asked, and the answer was not given, in a vacuum. Indeed, the trial court had already instructed the jury on the elements of the natural and probable consequences of aiding and abetting—the same elements defendant claims were missing from the court's response.

"[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular

75

instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538 [disapproved on other grounds by *People v. Reyes* (1998) 19 Cal.4th 743].) "The absence of an essential element from one instruction may be cured by another instruction or the instructions taken as a whole. [Citation.] Further, in examining the entire charge we assume that jurors are ' " ' "intelligent persons and capable of understanding and correlating all jury instructions which are given." ' [Citation.]" [Citations.]' " (*People v. Smith* (2008) 168 Cal.App.4th 7, 13 [quoting *People v. Guerra* (2006) 37 Cal.4th 1067, 1148].)

Here, the court had already instructed the jury *twice* on all requisite elements of aiding and abetting and the natural and probable consequences doctrine. The court's instructions on natural and probable consequences specifically included the offenses of shooting at an inhabitable dwelling and negligent discharge of a firearm as target offenses, with murder as the nontarget offense. Nothing in the court's answer stated or implied that the jury should ignore the court's prior instructions, and no reasonable jury could have interpreted the court's answer to mean that it should do so. To the contrary, the jury's question explicitly referred to the page number and CALCRIM number on the paper copy of the full jury instruction the court had given the jury on natural and probable consequences. This shows the jury had in mind the full definition of the doctrine when it formulated its question.

Defendant argues the jury must have been mistaken about the meaning of the doctrine because the question used the phrase "natural and probable *result*" instead of "natural and probable *consequences.*" (Italics added.) But the jury had previously been properly instructed twice in accord with CALCRIM No. 403 as follows: "A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence." Again, nothing in the court's answer to the jury's question implied that the jury should ignore previous

76

instructions.  Nor does the fact that the jury used the word "result" instead of "consequences" suggest the jury forgot or misunderstood any previous instructions.

Defendant argues the trial court impermissibly directed a guilty verdict by answering the question affirmatively because the jury asked "*must* we find the defendant guilty of murder . . . ."  (Italics added.)  Defendant contends that by instructing the jury that they "must" find defendant guilty of murder, the court infringed upon the jury's duty to find an element of the offense and relieved the prosecution of its burden to prove guilt beyond a reasonable doubt.  (See *People v. Figueroa* (1986) 41 Cal.3d 714 [trial court erroneously ordered directed verdict by removing from jury's consideration the question of whether promissory notes were securities].)  Specifically, defendant argues that the court eliminated the jury's duty to find (1) whether defendant knew of the perpetrator's unlawful intent, (2) whether defendant intended to aid and abet the perpetrator's offense, and (3) that murder was a reasonably foreseeable consequences of the perpetrator's offense.  But this argument ignores that the court had already instructed the jury on those elements, as set forth above.  And the premise of the jury's conditional question—"*[i]f* we agree that the accused is guilty of . . . shooting at an inhabited dwelling *and* we agree that murder is a natural and probable result" (italics added)—implicitly assumes the jury had found the necessary factual elements under the doctrine.  The court's affirmative answer did not direct the jury to find any facts or elements, notwithstanding the use of the word "must."  (See *People v. Yarbrough* (2008) 169 Cal.App.4th 303, 316 [court's instruction did not remove any issue of fact from the jury or direct a verdict for the prosecution].)

Defendant's reliance on *People v. Figueroa*, *supra*, 41 Cal.3d 714, is misplaced.  There, the trial court directed the jury that an element of the offense—the fact of whether certain promissory notes constituted securities—would be decided by the court as a matter of law.  Here, the trial court properly allowed the jury to find all required elements of the offenses and properly instructed the jury on the definition of those elements.  The

court's answer to the jury's question did not instruct the jury to find any fact or element; it was strictly an instruction based on law. We conclude the trial court did not direct a verdict for the prosecution.

Finally, defendant contends the trial court's answer impermissibly allowed the jury to convict him based on a theory of second degree felony murder. Defendant relies on *Chun*, *supra*, 45 Cal.4th 1172, in which the California Supreme Court upheld the second degree felony-murder rule but held that "all assaultive-type crimes, such as a violation of section 246 [shooting at an occupied vehicle], merge with the charged homicide and cannot be the basis for a second degree felony-murder instruction." (*Id.* at p. 1178.)

Here, the trial court did not instruct the jury on second degree felony murder. Defendant argues, however, that the court's answer to the jury's question implicitly directed the jury to convict him of murder if the killing "resulted" from an assaultive felony. But this argument ignores the full wording of the jury's question, which explicitly referenced the doctrine of natural and probable consequences. Under that doctrine, the jury was required to find that murder was a reasonably foreseeable consequence of the intended target offense—shooting at an inhabited dwelling. No such finding would have been required under a felony-murder instruction. In accord with these principles, the California Supreme Court has held that "[a]n aider and abettor's liability for murder under the natural and probable consequences doctrine operates independently of the felony-murder rule." (*People v. Chiu* (2014) 59 Cal.4th 155, 166 (*Chiu*).) Thus, the court's answer did not amount to an instruction on felony murder, and there is no reasonable possibility the jury could have interpreted it in that way.

We conclude that, in the context of the jury instructions as a whole, the court's answer to the jury's question was not a misstatement of the law. Furthermore, there is no reasonable probability the jury misunderstood or misapplied the court's answer in

78

violation of defendant's rights.  For these reasons, we conclude this claim is without merit.

### 3. *The Trial Court Properly Denied Defendant's Motion for a New Trial*

In May 2012, defendant moved for a new trial based on claims of error in the trial court's answer to the jury's question.  The grounds raised in the motion were identical to those discussed above:  that the court's answer constituted a directed verdict, usurping the jury's role as fact finder; and that the court's instruction constituted an impermissible felony-murder instruction under *Chun*, *supra*, 45 Cal.4th 1172.[20]  Defendant supported his claim with an email from one of the jurors stating that the jury found defendant guilty on Count One due to the court's answer to the jury's question.  The trial court struck the juror's emailed statement because it concerned the juror's subjective decision-making process.  (See Evid. Code, § 1150 [governing the admissibility of evidence concerning jurors' mental processes].)  The court then denied the motion for a new trial.

" 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 730 [citing *People v. Davis* (1995) 10 Cal.4th 463, 524].)  The trial court correctly found no support in the law for defendant's claims, as discussed above in Section II.I.2.  For these reasons, we conclude the trial court did not abuse its discretion in denying defendant's motion for a new trial.

### J. *The Trial Court's Management of Jurors in Deliberations*

Defendant contends the trial court erred by discharging one juror and by refusing to discharge another juror during deliberations.

---

[20] The motion also claimed the trial court failed to sentence defendant in the time required under Penal Code section 1191.  Defendant does not raise this claim on appeal.

1. *Procedural Background*

On a Monday morning, after approximately six days of deliberations by the first reconstituted jury, the foreperson notified the court that Juror No. 2 had a scheduling hardship. Juror No. 2 subsequently informed the court that her husband had recently undergone serious surgery, requiring her to perform daycare duties while simultaneously tending to her husband at the hospital. The foreperson expressed his opinion that the jury's deliberations would be impeded if Juror No. 2 were granted time off to care for her family.

The prosecution proposed to replace Juror No. 2 with an alternate juror. Defendant pointed out that the jury would be required to begin deliberations from the beginning and suggested that the court question the alternate juror to ensure the jury would be able to begin anew. After the parties spent some time discussing the best course of action, the prosecution stated, "[L]et's just replace her." Defense counsel responded, "I agree." At no point did defendant lodge any objection to excusing Juror No. 2. Defense counsel subsequently described his agreement as "yield[ing] to necessity" as opposed to a tactical decision, but he again failed to lodge any objection. The trial court then discharged Juror No. 2, replaced her with an alternate juror, and instructed the jury to begin deliberations anew.

On the following day, Tuesday, after a total of seven hours of deliberations by the second reconstituted jury, the alternate juror who had replaced Juror No. 2 (Replacement Juror No. 2) presented the court with a hardship claim of his own. Replacement Juror No. 2, a unionized firefighter, explained that he had suffered a dearth of overtime shifts in the previous year. As a result, he stated, "My income is approximately my tax guy said 50 percent of last year." He stated that he had accepted and been paid for a 24-hour overtime shift on Thursday, and that he would be required to pay back the money if he could not work the shift. He initially told the court he stood to lose $1,200, but when pressed on the figure, he admitted, "That's overstated definitely." On further

questioning, he estimated he would lose between $384 and $480. The juror then gave a somewhat rambling narrative stating that he had recently started a home improvement project with permits requiring periodic sign-off every six months. He complained that spending time as a juror would prevent him from working on the project and he estimated he would probably lose $10,000 to $12,000 if his permits were pulled.

The trial court rejected Replacement Juror No. 2's hardship claim and instructed the jury to continue deliberating. Defendant, citing his rights to due process and a fair trial, moved for reconsideration on the ground that the juror would be under pressure to agree to a verdict based on his economic circumstances. The prosecution responded that the degree of financial hardship was not significant enough to support the juror's claim. The trial court, finding there was no threat of a "rush to judgment" given the seriousness of the charges and the jury's history of thorough deliberations, denied defendant's request. The second reconstituted jury returned its verdicts two days later.

2. *Legal Principles*

Penal Code section 1089 provides, in part, that if a juror, upon "good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box . . . ." (Pen. Code, § 1089.) " 'Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty "to make whatever inquiry is reasonably necessary" to determine whether the juror should be discharged.' " (*People v. Leonard* (2007) 40 Cal.4th 1370, 1409 [quoting *People v. Espinoza* (1992) 3 Cal.4th 806, 821].) " 'The determination of "good cause" rests in the sound discretion of the court [citations], and the court's finding thereof will be upheld if substantial evidence supports it [citation].' " (*People v. Fudge* (1994) 7 Cal.4th 1075, 1099 [quoting *People v. Johnson* (1993) 6 Cal.4th 1, 21].) A defendant must lodge "a contemporaneous and specific objection" in the trial court to properly raise a claim on appeal for the improper discharge of a juror

due to personal hardship.  (*People v. Mickey* (1991) 54 Cal.3d 612, 664; see also *People v. Seaton* (2001) 26 Cal.4th 598, 639 [any error was invited by defendant's stipulation to removal of juror].)

> 3. *The Trial Court Did Not Abuse Its Discretion by Discharging Juror No. 2 and Refusing to Discharge Replacement Juror No. 2*

Defendant contends the trial court had no good cause for the discharge of Juror No. 2.  The Attorney General argues that defendant forfeited this claim by failing to object in the court below.  We agree with the Attorney General.

Defendant failed to object to the removal of Juror No. 2 and ultimately agreed with the prosecution's request to remove her.  Defendant disputes this characterization and argues that trial counsel only agreed to Juror No. 2's removal "after the trial court unreasonably refused to inquire further about how the exclusion of the juror would impact jury deliberations."  But the record shows that defendant's trial counsel merely suggested that the court inquire as to the alternate juror's availability before removing her.  At no time did trial counsel state a specific objection or set forth sufficient grounds for such an objection.  Ultimately, counsel conceded the "necessity" of removing Juror No. 2.  Defendant thus forfeited his claim.  Furthermore, the trial court held a hearing as required and the record provides substantial evidence for a finding of good cause.

Defendant also contends the court erred by refusing to discharge Replacement Juror No. 2 because its refusal to do so pressured the replacement juror to agree with the majority's desire to convict defendant.  Defendant points out that the jury returned its verdicts only two days after the court's ruling.  The Attorney General contends the court's removal of the juror did not constitute an abuse of discretion.  She notes that the jury returned its verdicts after Replacement Juror No. 2 had already lost his chance to accept the overtime shift, such that he was no longer under pressure to assent.

We conclude the trial court did not abuse its discretion by refusing to discharge Replacement Juror No. 2.  First, it is apparent from the record that the replacement juror

had initially exaggerated the degree of his financial hardship. Defendant contends Replacement Juror No. 2 stood to lose $1,200 in overtime pay, but the juror admitted this was an overstatement. When questioned specifically about how much money he would lose, he estimated he would have been paid "somewhere around the [$]16, $20 an hour range" for the 24-hour shift. He then added: "Somewhere in there. I'm not exactly sure what it is." The record supports a finding that the loss of his overtime shift cost him $480 at most. Second, as to his home remodeling project, the juror's statement was vague and replete with ambiguities. Nothing in his explanation demonstrated he was actually in imminent danger of losing $10,000 or more as a result of his service on the jury. Finally, substantial evidence supported the trial court's finding that the newly reconstituted jury would deliberate diligently and conscientiously based on the past conduct of the existing jurors.

For these reasons, we conclude the trial court's management of Juror No. 2 and Replacement Juror No. 2 did not constitute an abuse of discretion.

K. *Constitutionality of the Doctrine of Natural and Probable Consequences*

Defendant challenges the constitutionality of the doctrine of natural and probable consequences on several grounds. Defendant acknowledges that the California Supreme Court has upheld the doctrine against claims that it violates due process by allowing a jury to convict a defendant of murder without finding malice. (See *People v. Richardson* (2008) 43 Cal.4th 959, 1021-1022; *People v. Garrison* (1989) 47 Cal.3d 746, 777-778; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1231-1232.) Defendant asks that we reconsider these holdings in light of *Chun*, *supra*, 45 Cal.4th 1172.[21] But the California Supreme Court has already upheld the doctrine against a due process claim in a post-

---

[21] Defendant also frames this claim as a violation of his right to a fair trial. But the logic of his argument—that the doctrine eliminates the requisite finding of malice—is indistinguishable from those rejected by prior courts on due process grounds. We reject this claim for the same reasons.

*Chun* case. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 184.) Therefore, we must reject defendant's due process claim under *Auto Equity*, *supra*, 57 Cal.2d 450.

Defendant also challenges the doctrine of natural and probable consequences as violating the separation of powers and the equal protection clauses of the California and United States Constitutions.

1. *The Doctrine of Natural and Probable Consequences Does Not Violate the Separation of Powers*

Defendant contends the doctrine of natural and probable consequences violates the separation of powers because the doctrine lacks any statutory basis and only the Legislature holds the power to define crimes. We conclude the doctrine is properly justified under the courts' power to interpret the language of the Penal Code based on common law principles.

Penal Code section 6 provides, in part: "No act or omission . . . is criminal or punishable, except as prescribed or authorized by this Code . . . ." (Pen. Code, § 6.) Thus, " 'subject to the constitutional prohibition against cruel and unusual punishment, the power to define crimes and fix penalties is vested exclusively in the legislative branch.' " (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 516 [quoting *Keeler v. Superior Court* (1970) 2 Cal.3d 619, 631 (*Keeler*), superseded by statute on other grounds as stated in *People v. Taylor* (2004) 32 Cal.4th 863, 870].) "[S]ome statutory or regulatory provision must describe conduct as criminal in order for the courts to treat that conduct as criminal." (*Chun*, *supra*, 45 Cal.4th at p. 1183.) However, many provisions of the Penal Code use common law terms that must be interpreted in light of the common law. (*Ibid.*) " 'It will be presumed ... that in enacting a statute the Legislature was familiar with the relevant rules of the common law, and, when it couches its enactments in common law language, that its intent was to continue those rules in statutory form.' " (*Id.* at p. 1184 [quoting *Keeler*, *supra*, at p. 625].) Thus, "we are free

84

to look to the common law to supply the requisite certainty to an existing statute." (*People v. Heitzman* (1994) 9 Cal.4th 189, 212, fn. 19.)

Penal Code section 31 provides, in part: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." (Pen. Code, § 31.) Conspirators are included as principals under this statute. (*In re Hardy* (2007) 41 Cal.4th 977, 1025.) Penal Code sections 182 and 184 further define and punish the act of conspiring to commit an offense. The wording of these statutes necessarily requires courts to interpret the meaning of terms such as "aid and abet" and "conspire."

Common law theories of liability based on aiding and abetting and conspiracy predate the enactment of the statutes described above. (See *People v. Coffey* (1911) 161 Cal. 433, 439 [superseded by statute].) Furthermore, these theories have long incorporated the doctrine of natural and probable consequences. "The natural and probable consequences doctrine was recognized at common law and is firmly entrenched in California law as a theory of criminal liability." (*Chiu*, *supra*, 59 Cal.4th at p. 163.) "At common law, a person encouraging or facilitating the commission of a crime could be held criminally liable not only for that crime, but for any other offense that was a 'natural and probable consequence' of the crime aided and abetted." (*People v. Prettyman* (1996) 14 Cal.4th 248, 260 [citing 1 Wharton's Criminal Law (15th ed. 1993) Parties, § 35, p. 207].) While the doctrine has been criticized, "it is an 'established rule' of American jurisprudence [citation]." (*Ibid.*)

As noted in *People v. Prettyman*, *supra*, 14 Cal.4th at page 260, the California Supreme Court embraced the doctrine of natural and probable consequences as an aspect of conspiracy liability more than a century ago in *People v. Kauffman* (1907) 152 Cal. 331, 332. " 'The general rule is well settled that where several parties conspire or combine together to commit any unlawful act, each is criminally responsible for the acts

of his associates or confederates committed in furtherance of any prosecution of the common design for which they combine . . . . Each is responsible for everything done by his confederates, which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original design or common plan. Nevertheless the act must be the ordinary and probable effect of the wrongful act specifically agreed on, so that the connection between them may be reasonably apparent, and not a fresh and independent product of the mind of one of the confederates outside of, or foreign to, the common design.' " (*Id.* at p. 334, quoting 8 Cyclopedia of Law & Procedure (1903) p. 641.) Courts have long accepted the doctrine in the context of aiding and abetting as well. "In this state those persons who aid and abet in the commission of a criminal offense, though not being present, are liable for all the natural and probable consequences incident to the commission of the act which they have counseled or advised." (*People v. King* (1938) 30 Cal.App.2d 185, 203.)

We decline to overturn this longstanding doctrine. For decades, California courts have embraced the doctrine alongside the statutory provisions that define aiding and abetting and conspiracy. We conclude that a court's adoption of the doctrine constitutes a lawful exercise of its power to interpret the language of those statutes in accord with the common law.

    2. *The Doctrine of Natural and Probable Consequences Does Not Violate Equal Protection*

Defendant contends the doctrine of natural and probable consequences violates equal protection as applied to second degree murder when the target offense is assaultive in nature. He points out that his conduct could not constitute second degree felony murder under *Chun*, *supra*, 45 Cal.4th 1172, and he argues that he is no more culpable than the defendant in that case. He contends he is situated similarly to Chun and argues that there is no rational basis for treating him differently. For the reasons below, we disagree that defendant is placed in a worse legal position than Chun as a result of the

86

natural and probable consequences doctrine. We therefore find no equal protection violation.

"The state may not . . . arbitrarily accord privileges to or impose disabilities upon one class unless some rational distinction between those included in and those excluded from the class exists. 'The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment.' " (*In re Gary W.* (1971) 5 Cal.3d 296, 303 [quoting *Purdy & Fitzpatrick v. State of California* (1969) 71 Cal.2d 566, 578].) "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." (*In re Eric J.* (1979) 25 Cal.3d 522, 530, italics in original.) "This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' " (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 [quoting *People v. Gibson* (1988) 204 Cal.App.3d 1425, 1438].) " ' "[I]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. [Citations.] Where there are 'plausible reasons' for [the classification], 'our inquiry is at an end.' " ' " (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 481-482 [quoting *FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 313.)

In *Chun*, *supra*, 45 Cal.4th 1172, the California Supreme Court reconsidered the constitutionality of the merger doctrine in the context of a second degree felony murder. The case involved a drive-by shooting perpetrated by Chun and at least two others in his car. They used three guns to fire at least six shots at a neighboring car that had three occupants, killing one of the passengers. Chun confessed to being one of the shooters, but claimed he only intended to scare the other passengers. Among other charges, the

87

trial court instructed the jury on second degree felony murder with shooting at an occupied motor vehicle as the underlying felony. The California Supreme Court held that the trial court erred by instructing the jury on second degree felony murder because the underlying felony was assaultive in nature. (*Id.* at p. 1200.) The court concluded that if the underlying felony is assaultive in nature then it merges with the homicide and cannot be the basis of a felony-murder instruction. (See *People v. Ireland* (1969) 70 Cal.2d 522, 539 [a second degree felony-murder instruction is improper if it is based on a felony that is an integral part of the homicide and included within the charged offense].) The court declined to specify what other crimes might constitute assaultive felonies for the purposes of the merger rule, but we will assume for the sake of argument that shooting at an inhabited dwelling under the circumstances of this case would qualify as an assaultive felony.

Defendant contends he is similarly situated to Chun, and he complains that he has been placed "in a worse legal position" due to the natural and probable consequences doctrine. We disagree. While there may be factual similarities between the two cases, defendant was *not* treated more harshly than Chun. Our high court in *Chun* found the erroneous felony-murder instruction to be harmless beyond a reasonable doubt because the jury found defendant guilty of second degree murder based on a different theory of liability. Under the facts of that case, the jury had abundant evidence on which it could have convicted Chun of second degree murder as an aider and abettor under the doctrine of natural and probable consequences. Thus, in the absence of the erroneous felony-murder instruction, Chun faced the same degree of liability defendant faced here.

Defendant would only be in a "worse legal position" than a defendant protected by the holding of *Chun* if that defendant were not also subject to aider and abettor liability— e.g., if the other defendant had acted alone. But such a defendant would not be similarly situated. Furthermore, there is a rational basis for expanded liability when multiple defendants act in concert: The mere fact of cooperation by multiple persons creates a

88

higher degree of culpability. As the United State Supreme Court observed in the context of conspiracy, "For two or more to confederate and combine together to commit or cause to be committed a breach of the criminal laws is an offense of the gravest character, sometimes quite outweighing, in injury to the public, the mere commission of the contemplated crime." (*United States v. Rabinowich* (1915) 238 U.S. 78, 88.) As a safeguard against this expanded liability, the doctrine of natural and probable consequences includes an additional element: The jury must find that the nontarget offense is reasonably foreseeable. This is a required factual finding based on the individual circumstances of the defendant's case. By contrast, no such finding is required under a felony-murder instruction. Instead, the court determines in the abstract whether the underlying felony is "inherently dangerous" based on the elements of the offense. (*People v. Patterson* (1989) 49 Cal.3d 615, 617-618 [offense of furnishing cocaine is inherently dangerous].) Thus, even assuming the dissimilar consequences of these two doctrines requires justification on equal protection grounds, the law provides a rational basis for these differences.

We conclude that the doctrine of natural and probable consequences does not violate equal protection, nor any other constitutional right asserted by defendant.

L. *Claims of Sentencing Error*

Defendant contends the trial court's sentence of 22 years to life violated his rights in several regards. We conclude the court's imposition of sentence did not constitute an abuse of discretion, nor did it violate defendant's constitutional rights.

1. *Procedural Background*

The prosecution filed a statement in aggravation and requested consecutive sentences based on *People v. Felix* (2009) 172 Cal.App.4th 1618, 1631 (*Felix*) [multiple victim exception to Penal Code section 654 justified where defendant shot at an inhabited dwelling with multiple occupants].) Defendant opposed the request on the ground that both convictions arose from the same act under Penal Code section 654 (Section 654).

89

The probation officer recommended a term of 15 years to life for the murder conviction, consecutive to the upper term of seven years for shooting at an inhabited dwelling. The probation report identified five factors in aggravation (Cal. Rules of Court, rule 4.421(a)(1), (a)(2), (a)(3), (a)(4) & (b)(1)) and one factor in mitigation—the lack of a prior record (Cal. Rules of Court, rule 4.423(b)(1)).

At sentencing, the court stated that it had carefully considered the parties' filings as well as the probation report. The court denied probation and sentenced defendant in accord with probation's recommendation to a term of 15 years of life consecutive to seven years. The court emphasized that the crime involved "a random act which occurred where it was a social event but people were trying to keep the peace in [*sic*]." The court stated that it imposed the upper term for shooting at an inhabited dwelling based on "the fact that there were other victims, many other victims involved potentially . . . ." The court ruled that it had discretion to impose consecutive sentences under the multiple victim exception to Section 654 as set forth in *Felix*, *supra*, 172 Cal.App.4th 1618, and other cases. The court found that consecutive sentences were justified based on "the potential harm that could have been ravaged on people who were unsuspecting at a gathering in this case who had no understanding of what was going on other than the fact there were multiple shots fired."

2. *Standard of Review*

A trial court's sentencing decision is subject to review for abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847 (*Sandoval*).) "The trial court's sentencing discretion must be exercised in a manner that is not arbitrary and capricious, that is consistent with the letter and spirit of the law, and that is based upon an 'individualized consideration of the offense, the offender, and the public interest.' " (*Ibid.*) A trial court abuses its discretion "if it relies upon circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decision." (*Ibid.*) A single factor in aggravation may support imposition of an upper term. (*People*

*v. Castellano* (1983) 140 Cal.App.3d 608, 615.) A single factor may also justify consecutive sentences, but a fact used to impose the upper term may not also be used to impose consecutive sentences. (*People v. Osband* (1996) 13 Cal.4th 622, 732; Cal. Rules of Court, rule 4.425(b).) While the trial court was obliged to consider factors in mitigation as well as aggravation, it was not required to set forth its reasons for rejecting mitigating factors. (*People v. Jones* (1985) 164 Cal.App.3d 1173, 1181 (*Jones*).)

3. *Imposition of the Aggravated Term for Shooting at an Inhabited Dwelling Was Not an Abuse of Discretion*

Defendant argues that the trial court erred by sentencing him to the aggravated term of seven years for shooting at an inhabited dwelling. He argues that the court failed to take into account all factors in mitigation, including that he was a passive participant or played a minor role; that he was induced by others to participate in the crime; and his young age. We find no abuse of discretion.

The trial court was not required to state on the record its reasons for rejecting factors in mitigation. (*Jones*, *supra*, 164 Cal.App.3d at p. 1181.) Regardless, the record does not support defendant's claim that he was a passive participant or played a minor role in the crime. Defendant contends he tried to stop the confrontation with the partygoers. He supports this assertion with the testimony of witnesses who saw him put his hands up during the argument just before he and his friends retreated to their cars. But this ignores that defendant and two others immediately returned with their firearms. The most reasonable inference is that defendant put up his hands not out of any desire for peace, but because stopping the fight would give him the opportunity to retrieve his weapon. The record also does not support defendant's assertion that he was induced by others to commit the crime. And while a trial court has the discretion to consider a defendant's youth as a mitigating factor to the extent it is reasonably related to sentencing (Cal. Rules of Court, rule 4.408(a)), nothing in the Rules of Court required the court to set forth on the record its consideration of defendant's age.

91

Defendant also argues that the factors in aggravation found by the probation officer were not supported by the record. Although the court did not state its reliance on the aggravating factors defendant now challenges, we find the record sufficient to support these findings. More importantly, the record supports the trial court's finding that defendant's actions put a large number of persons at great risk of harm. This factor was sufficient to support an aggravated sentence.

Accordingly, we conclude the trial court did not abuse its discretion by imposing the aggravated term for shooting at an inhabited dwelling.

4. *Imposition of Consecutive Sentences Did Not Violate Section 654 or Constitute an Abuse of Discretion*

Defendant contends the trial court violated Section 654 by imposing consecutive sentences because both convictions were based on the same act. The Attorney General, relying on *Felix*, *supra*, 172 Cal.App.4th 1618, argues that Section 654 does not bar multiple punishments for the same act where the defendant's conduct put multiple victims at risk. We hold that Section 654 does not bar multiple punishments under the circumstances here, where a defendant fires multiple gunshots at multiple victims in clear sight, and one of the victims is killed.

Section 654, subdivision (a) provides, in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Section 654 thereby bars the imposition of multiple sentences for a single act or omission, even though the act or omission may violate more than one provision of the Penal Code. (*People v. Mesa* (2012) 54 Cal.4th 191, 195.) But Section 654 does not necessarily bar multiple punishments where a single act of violence harms more than one person.

"The purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability. A defendant

92

who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person. For example, a defendant who chooses a means of murder that places a planeload of passengers in danger, or results in injury to many persons, is properly subject to greater punishment than a defendant who chooses a means that harms only a single person. This distinction between an act of violence against the person that violates more than one statute and such an act that harms more than one person is well settled." (*Neal v. State* (1960) 55 Cal.2d 11, 20 [overruled in part on another ground as stated in *People v. Correa* (2012) 54 Cal.4th 331].)

In *Felix*, the defendant fired two gunshots into the home of the intended victim. (*Felix*, *supra*, 172 Cal.App.4th at p. 1621.) The defendant knew the intended victim was home, and he knew it was highly likely that two children were also in the house. Both bullets penetrated the house, but neither struck any of several occupants. A jury convicted Felix of attempted murder and shooting at an inhabited dwelling, among others charges. The trial court imposed concurrent terms. On appeal, Felix challenged the imposition of concurrent sentences under Section 654 on the ground that both convictions arose from a single indivisible course of conduct. The Court of Appeal affirmed the concurrent sentences under the multiple victim exception to Section 654.

We likewise conclude the trial court's imposition of consecutive sentences was not an abuse of discretion. Defendant was substantially more culpable than the defendant in *Felix*. Defendant and his coparticipants fired at least 13 rounds at a large crowd of people standing in clear sight without the protection of a house. Forensic evidence showed that multiple gunshots were fired from all three guns used in the shooting, such that defendant himself must have fired multiple shots. And while only one victim was killed, numerous other persons were placed at immediate risk of death or great bodily injury. Under these circumstances, the imposition of multiple sentences was justified under the multiple victim exception to Section 654. (See *Felix*, *supra*, 172 Cal.App.4th

1618; *People v. Anderson* (1990) 221 Cal.App.3d 331; *People v. McFarland* (1989) 47 Cal.3d 798, 801.)  Furthermore, the court did not abuse its discretion by imposing the sentences consecutively based on a finding that the partygoers constituted an unsuspecting and vulnerable group of victims.

Defendant further argues that the imposition of consecutive sentences violated his Sixth Amendment right to a jury trial under *Blakely v. Washington* (2004) 542 U.S. 296, 298.  He contends that the basis for consecutive sentences—the existence of multiple victims—was neither alleged by the prosecution nor found true by the jury.  But in *Oregon v. Ice* (2009) 555 U.S. 160, 164, the United States Supreme Court upheld the constitutionality of consecutive sentencing based on facts found by trial courts.  Defendant makes no attempt to distinguish that case.  Accordingly, we find this claim without merit.

5.  *The Sentence Was Not Cruel and Unusual*

Defendant contends his sentence of 22 years to life constituted cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution and article I of the California Constitution.  Defendant points out that Tramel and Lavell were both convicted of voluntary manslaughter and sentenced to determinate terms.  He contends further that Tramel and Lavell bore greater culpability for the shooting.  He further contends that he was 17 years old at the time of the offense, and that it is unlikely he will be released from prison during his lifetime.  He argues that his sentence is the functional equivalent of life without the possibility of parole, which may not be imposed on a minor under *Miller v. Alabama* (2012) 132 S.Ct. 2455.  (See also *Graham v. Florida* (2010) 560 U.S. 48 [Eighth Amendment prohibits imposition of life without parole sentence on juvenile offender who did not commit homicide]; *People v. Caballero* (2012) 55 Cal.4th 262 [sentencing a juvenile offender for a non-homicide offense to a term of years with a parole eligibility date that falls outside the offender's natural life expectancy violates the Eighth Amendment].)

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." "To determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to ' "the evolving standards of decency that mark the progress of a maturing society." ' " (*Graham v. Florida*, *supra*, 560 U.S. at p. 58 [quoting *Estelle v. Gamble* (1976) 429 U.S. 97, 102].) "The concept of proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' " (*Graham v. Florida*, *supra*, 560 U.S. at p. 59 [quoting *Weems v. United States* (1910) 217 U.S. 349, 367].) With respect to state law, "[i]mposition of a sentence 'grossly disproportionate to the offense for which it is imposed' is a violation of the prohibition against cruel or unusual punishment under article I, section 17, of the California Constitution." (*People v. Kaurish* (1990) 52 Cal.3d 648, 716.)

We will disregard defendant's comparison of his sentence with those of Tramel and Lavell. Evidence of sentences received by coparticipants in an offense is irrelevant to the proportionality of a defendant's sentence. (*People v. Thomas* (2012) 54 Cal.4th 908, 940.) As to his own culpability, defendant argues that he attempted to stop the fight prior to the shooting. As noted above in Section II.L.3., the record belies this benevolent characterization of his intentions.

In *People v. Perez* (2013) 214 Cal.App.4th 49, the Court of Appeal analyzed several California cases considering whether the imposition of various sentences constituted the functional equivalent of life without parole. (*Id.* at pp. 55-57.) The court observed: "There is a bright line between LWOPs and long sentences *with* eligibility for parole *if* there is some meaningful life expectancy left when the offender becomes eligible for parole. We are aware of—and have been cited to—no case which has used the *Roper–Graham–Miller–Caballero* line of jurisprudence to strike down as cruel and unusual any sentence against anyone under the age of 18 where the perpetrator still has

95

substantial life expectancy left at the time of eligibility for parole." (*Id.* at p. 57, original italics.) The court found Perez—who was sentenced to 30 years to life for several non-homicide offenses—would be eligible for parole at 47 years of age. The court rejected the argument that Perez's sentence constituted a "de facto" sentence of life without parole, and the court concluded his sentence was constitutional under both the federal and state constitutions.

Here, defendant was sentenced to 22 years to life for second degree murder and shooting at an inhabited dwelling. The Attorney General estimates defendant will be eligible for parole at approximately 36 years of age. Defendant does not dispute this estimate, and the record sufficiently supports it. Defendant presents statistics to demonstrate that very few defendants sentenced to life are granted parole. We decline to speculate about the conduct of the parole board decades into the future. Accordingly, we find defendant's sentence is not the functional equivalent of life without the possibility of parole. Furthermore, based on his substantial culpability for the death of Michael DeJesús, we conclude defendant's sentence is not disproportionate to the offense under either the federal or state constitutions.

M. *Defendant Suffered No Cumulative Prejudice Sufficient to Require Reversal*

Finally, defendant contends the cumulative prejudicial effect of multiple errors requires reversal of his conviction. "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) Here, we have identified two errors. First, we conclude the trial court erred by admitting testimonial hearsay statements by the prosecution's gang expert. Second, we conclude the court erroneously excluded expert testimony proffered by defendant to impeach the prosecution's gang expert.

Both errors pertained primarily to the evidence supporting the gang allegations attached to each count. As we note above, it is unclear how defendant could have

suffered prejudice as to the gang allegations when the jury returned no findings on any of those allegations.  And while, hypothetically, the errors concerning gang-related evidence could have biased the jury against defendant with respect to the substantive offenses, the record does not support any such findings of prejudice.  In the absence of any prejudice from either of the errors, we conclude defendant did not suffer any cumulative prejudice. We therefore find this claim without merit.

### III.   DISPOSITION

The judgment is affirmed.

_____
Márquez, J.

I CONCUR:


_____
 Rushing, P. J.




I CONCUR IN THE JUDGMENT ONLY:



_____
 Elia, J.




No. H038422
People v. Edwards

| | |
|---|---|
| Trial Court: | Santa Clara County<br>Superior Court No.:  CC512062 |
| Trial Judge: | The Honorable Philip Pennypacker |
| Attorney for Defendant and Appellant<br>Michael Edwards: | James S. Thomson<br>under appointment by the Court of<br>Appeal for Appellant |
| Attorneys for Plaintiff and Respondent<br>The People: | Kamala D. Harris,<br>Attorney General |
| | Dane R. Gillette,<br>Chief Assistant Attorney General |
| | Gerald A. Engler,<br>Senior Assistant Attorney General |
| | Catherine A. Rivlin,<br>Supervising Deputy Attorney General |
| | Bruce M. Slavin,<br>Deputy Attorney General |

People v. Edwards
H038422